**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ricardo MAXWELL (97–3196); Alvin Cordell (97–3482), Defendants–Appellants.**

**Nos. 97–3196, 97–3482.**

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 24, 1998.

Decided Nov. 17, 1998.

Arthur P. Anninos (argued and briefed), Cincinnati, Ohio, for Defendant–Appellant Maxwell.

Philip E. Pitzer (argued and briefed), Cincinnati, Ohio, for Defendant–Appellant Cordell.

William E. Hunt, Office of the U.S. Attorney (argued and briefed), Cincinnati, Ohio, for Plaintiff–Appellee.

Before: KENNEDY, WELLFORD, and BOGGS, Circuit Judges.

## OPINION

WELLFORD, Circuit Judge.

Defendants Alvin Cordell and Ricardo Maxwell appeal their convictions for drug offenses on several grounds. Cordell makes four arguments: (1) that the prosecutor violated his right to equal protection when he exercised a peremptory strike to exclude a single juror, who was the only remaining black member of the venire; (2) that the prosecutor impermissibly struck two other jurors, who were eighteen and twenty-one years old, respectively, on the basis of their age; (3) that he should not have received the mandatory life sentence contemplated by 21 U.S.C. § 841(b)(1)(A) because two previous separate drug offenses were required and his two prior drug offenses, though separate, were disposed of on the same day in what he claims is a "single plea agreement;" and (4) that the district court's failure to conduct a hearing to determine the impact that a dismissed juror may have had on the rest of the jury was clear error and deprived him of his Sixth Amendment right to a fair and impartial jury. Maxwell advances two arguments: (1) that there was insufficient evidence to support his conviction for drug offenses; and (2) that the district court erred by not reading Sixth Circuit Jury Instruction 3.03 on the law of conspiracy in its entirety. For the reasons that follow, we dismiss all of the defendants' arguments and **AFFIRM** the conviction and sentence of both defendants.

## I. BACKGROUND

Police first suspected Cordell's involvement in a conspiracy to possess and distribute drugs on September 30, 1992, when he was stopped in the St. Louis airport while waiting for a flight to Los Angeles. At the time, Cordell was carrying $41,880 in cash on his person. He initially gave the officers a false name, but eventually admitted that he was Alvin Cordell after officers discovered his drivers license in a bag he was carrying. He told the officers that he was going to Los Angeles to buy a Mercedes, which he would then drive back to Ohio. Yet he had a round trip ticket, and one of the police officers present observed a trained narcotics dog "alert" to the bag in which Mr. Cordell had the money, suggesting that the bag had been used to transport drugs in the past. These suspicious circumstances triggered an investigation into Cordell's suspected drug activities and eventually led to the arrest of both Cordell and Maxwell.

In July of 1994, a police officer stopped Cordell on the highway and recovered an empty UPS box with a shipping label from Southern California addressed to a residence

in Cincinnati. A narcotics dog from the Cincinnati police force was observed positively alerting to the presence of the odor of narcotics in the empty box. Four days later, the same police officer stopped a car seen leaving Cordell's residence. They found almost $79,000 in cash taped inside the pockets of a Cincinnati Reds jacket packed in a garment bag. One of the people in the car was Michael Bowens, who later cooperated with the government in its investigation of Cordell and Maxwell. Bowens testified at the trial that he had initially been Cordell's errand boy, picking up UPS packages sent from southern California to various vacant addresses in Cincinnati. Those packages contained drugs, either cocaine or marijuana, which Bowens would give to Cordell for processing and distribution. Eventually, Bowens also began to help Cordell distribute the drugs. He testified that he would go to pick up the drugs at Maxwell's apartment, which, as the items found during the search of the apartment would suggest, apparently served as one of Cordell's processing and storage centers. Bowens was present at Maxwell's apartment on March 20, 1996, when Cordell and Maxwell were processing cocaine into crack just prior to their arrests.

On the night of March 20, Bowens, who had already been arrested earlier that evening and was cooperating with the authorities without the knowledge of his coconspirators, received a call from Cordell, who instructed him to go to the airport to pick up Darrin Clack. Co-defendant Clack (who is not a party to this appeal) was apprehended in the Cincinnati airport in possession of a large quantity of crack cocaine. Cordell was at a downtown hotel awaiting delivery of the contraband, which Clack was carrying when arrested. Later that evening, police searched an apartment, to which defendant Ricardo Maxwell had access, and there they found almost five

pounds of marijuana, $33,200 in currency, a handgun, and a digital weighing scale with crack cocaine residue on it. Maxwell himself was arrested when he entered the apartment through the back door while police were finishing their search.

## II. CORDELL

### A. BATSON CHALLENGE–RACE

 First, Cordell argues that the prosecutor violated his equal protection rights when he exercised a peremptory strike to exclude a single juror, who was the only remaining black member of the venire.[1] In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that a defendant opposing the government's use of a peremptory strike on the basis of race makes out a prima facie case of purposeful discrimination by showing: (1) "that he is a member of a cognizable racial group ... [2] that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race .... [and 3] that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race."[2] *Id.* at 96, 106 S.Ct. at 1722. If the defendant successfully makes a prima facie showing, the burden shifts to the government to come forward with a neutral explanation for its challenges. *See id.* at 97, 106 S.Ct. at 1723. In *Purkett v. Elem*, 514 U.S. 765, 769, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995), the Court explained that, in order to satisfy its burden under this second step of the *Batson* analysis, the government must present a justification for its strike that does not deny equal protection.[3] Requirements for such a justification are not rigorous. *See id.* at 768, 115 S.Ct. at 1771. In the third step of the *Batson* analysis, the

---

1. At oral argument, in responding to the court's questions, the prosecutor recalled, without contravention, that three prospective jurors who were black were on the venire, but only one appeared for the trial.

2. The Supreme Court has subsequently modified the requirements of a prima facie *Batson* case to allow defendants to challenge the prosecution's alleged race-based strikes of jurors even where

the defendant and the stricken juror are of different races. *See Powers v. Ohio*, 499 U.S. 400, 402, 111 S.Ct. 1364, 1365, 113 L.Ed.2d 411 (1991).

3. The Supreme Court has extended *Batson*'s protections against racially-motivated strikes to strikes motivated by the prospective juror's gender as well. *See J.E.B. v. Alabama*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

trial court must decide "whether the opponent of the strike has proved purposeful racial discrimination." *Id.* at 767, 115 S.Ct. at 1770–71. In reviewing a *Batson* claim of racially-motivated peremptory strikes, "[t]his Court gives great deference to the district court's findings on the credibility of the prosecution's asserted neutral explanations." *United States v. Ferguson*, 23 F.3d 135, 141 (6th Cir.1994) (internal quotation marks omitted).

█ We note that two of the three criteria in the first step of the *Batson* analysis are met since Cordell is African–American. As for the third criteria, whether the circumstances raise an inference of racial exclusion, we make no finding, since it is not necessary to the result we reach. For the purposes of this appeal, however, we will assume that a prima facie case was made by Cordell. The prosecutor in this case specified three permissible reasons for its strike of the black juror: (1) she was a guidance counselor, and in his experience (over twenty years of service), guidance counselors were overly sympathetic with defendants; (2) she stated that she was particularly busy at the time because it was the beginning of the school year, and the prosecutor noted her "misgivings" about serving; and (3) she knew one of the defendants' lawyers from his high school days and also knew that lawyer's parents well. We conclude that these reasons amply satisfy the government's burden under step two of the *Batson* analysis. Given the plausibility of the prosecutor's reasons and the deference accorded the district court's findings regarding the credibility of those asserted justifications, there was no *Batson* violation in the prosecution's strike of Juror 17.

### B. AGE CHALLENGE

█ Cordell also argues that he was deprived of his right to equal protection by reason of the prosecutor's peremptory challenges to two other jurors, who were eighteen and twenty-one years old respectively, apparently thought to be too young to serve satisfactorily. The government concedes that age was a primary reason for its peremptory challenges. Cordell admits, however, "the lack of any current authority supporting its contention [in this respect] ... [of] this novel claim." While the Supreme Court has prevented peremptory strikes on the basis of race and gender, *see Batson*, 476 U.S. at 96, 106 S.Ct. at 1722, and *J.E.B.*, 511 U.S. at 127, 114 S.Ct. at 1419, it has not held that a party is unable to exercise peremptory strikes on the basis of age. Indeed, this court observed in *Ford v. Seabold*, 841 F.2d 677, 682 (6th Cir.1988), in rejecting a similar challenge:

> [W]e note that each circuit that has considered the question has rejected the contention that young adults comprise a distinct group. *See Barber* [*v. Ponte*, 772 F.2d 982, 1000 (1st Cir.1985) ]; *Cox v. Montgomery*, 718 F.2d 1036, 1038 (11th Cir.1983); *Davis v. Greer*, 675 F.2d 141, 146 (7th Cir.), *cert. denied*, 459 U.S. 975, 103 S.Ct. 310, 74 L.Ed.2d 289 (1982); *United States v. Potter*, 552 F.2d 901, 905 (9th Cir.1977); *United States v. Test*, 550 F.2d 577, 591 (10th Cir.1976); *United States v. Olson*, 473 F.2d 686, 688 (8th Cir.), *cert. denied*, 412 U.S. 905, 93 S.Ct. 2291, 36 L.Ed.2d 970 (1973); *United States v. DiTommaso*, 405 F.2d 385, 391 (4th Cir.1968), *cert. denied*, 394 U.S. 934, 89 S.Ct. 1209, 1210, 22 L.Ed.2d 465 (1969).
>
> For similar reasons, college students are not cognizable under *Duren*.[ 4]

*Seabold* held that "young adults and college students ... do not compose distinctive groups." *Id.* at 681. We also noted that "it is impossible to adequately define a 'young adult' ...." *Id.* at 682 n. 2.

█ Cordell is not constitutionally entitled to a jury representative and proportionate of every age group, or ethnic group, or educated (or non-educated) group in the district in which the trial is held. A criminal defendant has no affirmative right to a jury of a particular racial, gender or age composition. *See United States v. Mack*, 159 F.3d 208 (6th Cir.1998); *see also Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Cordell failed to make the necessary showing under *Seabold*, *Duren*, and the other

---

4. *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), addressed a "fair-cross-section" argument, concluding that a defendant must show that the group excluded is a "distinctive group" in order to establish a prima facie violation. *Id.* at 364, 99 S.Ct. at 668.

authorities mentioned to indicate deliberate exclusion of "distinctive groups" of the jury venire or jury panel involved.

■ Therefore, we find no established equal protection violation under the circumstances. We recognize, of course, that it is desirable to have young persons on a jury who are available and willing to serve, and that it is an inaccurate stereotype for anyone to claim that young people are not as capable as serving on a jury as older people are, simply because of their age. However, we also recognize the import of the venerable right to exercise peremptory challenges, and that defendants have considerably more such challenges than do prosecutors in the federal system. See Fed.R.Crim.P. 24(b). The practice of allowing peremptory challenges may be overridden only for the strongest constitutional reasons, which the Supreme Court has recognized in the cases of race and gender discrimination.

## C. *SENTENCE*

■ Cordell additionally argues that he should not have received the mandatory life sentence contemplated by 21 U.S.C. § 841(b)(1)(A) because he did not have the requisite two prior drug felony convictions. Cordell's argument is premised on the fact that he pled guilty to two separate drug offenses on the same day; he calls this a "single plea agreement." The facts are that Cordell was arrested on June 22, 1988, for one drug trafficking offense, and on July 13, 1989, for a different drug trafficking offense. These offenses were indicted separately, had separate case numbers in the Hamilton County Court of Common Pleas, were committed with different individuals, and carried sentences that ran consecutively.

As Cordell concedes, this court has held that prior felony convictions occurring at separate times and places and with different people constitute separate offenses. See United States v. Anderson, 76 F.3d 685, 691 (6th Cir.) (quoting United States v. Roach, 958 F.2d 679, 684 (6th Cir.1992)), cert. denied, ―― U.S. ――, 117 S.Ct. 91, 136 L.Ed.2d 47 (1996). Moreover, the Guidelines state that "[p]rior sentences imposed in unrelated cases are to be counted separately" if they were separated by an intervening arrest, as is the case with Cordell's prior con-

victions. U.S.S.G. § 4A1.2(a)(2); see also id. at cmt.(n.3) ("Prior sentences are not considered related if they were for offenses that were separated by an intervening arrest. . . ."). It is thus clear that these two convictions are separate drug trafficking offenses for purposes of § 841(b)(1)(A), and the district court was obligated to sentence Cordell to life imprisonment.

## D. *EXCUSING ANOTHER JUROR*

■ On the fifth day of the trial, Cordell's mother, Mary Daniels, testified on her son's behalf. After the close of the evidence for that day, and after the jury had been dismissed, Juror # 8 alerted the district court to the fact that he knew Mrs. Daniels because he was her UPS delivery man. The next morning, when all parties were again in court, the district court promptly addressed this matter, conducting a separate voir dire of Juror # 8, during which it was determined that he did not believe he could remain fair and impartial in deciding the case. The court allowed Juror # 8 to return to the jury box to hear closing arguments and the judge's instructions with the rest of the jurors. At the close of the case, however, this juror was designated an alternate and was dismissed from participation prior to jury deliberations. Although Cordell made no objection, he now argues that the district court's failure to conduct a hearing to determine the impact that Juror # 8 may have had on the remaining members of the panel constitutes clear error and deprived him of his Sixth Amendment right to a fair and impartial jury.

■ "Federal Rule of Criminal Procedure 52(b), . . . provides a court of appeals a limited power to correct errors that were forfeited because not timely raised in district court" and only if the error is plain and affects substantial rights. United States v. Olano, 507 U.S. 725, 731–35, 113 S.Ct. 1770, 1776–78, 123 L.Ed.2d 508 (1993). Where an appellate court finds such an error, it may, but is not required to, correct it. See id. at 735, 113 S.Ct. at 1778.

■ An application of the Olano analysis reveals no reversible error regarding the treatment of Juror # 8. Indeed, we find no

error, much less a plain error, in the court's handling of the situation. Juror # 8, realizing his potential taint, immediately notified the court, and the court conducted a separate voir dire of Juror # 8 as soon as was practicable. Moreover, since the jury was not sequestered and the jurors had dispersed for the day, any danger of prejudicial communications to other jurors between the time the judge was notified of the juror's misgivings and the subsequent voir dire was minimized. in light of the judge's repeated instructions to the jury as a whole, and to Juror # 8 in particular, that they were not to discuss the case with anyone until the close of the case. Since this case did not involve outside contact with a juror or statements among jurors that might indicate that the remaining jurors were tainted in any way, the court was not required to interview the jury to ascertain the existence of possible taint. *See Remmer v. United States,* 347 U.S. 227, 229–30, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954) (establishing the trial court's duty to interrogate the jury as to possible taint where there was any private communication, contact, or tampering, directly or indirectly, with any juror); *United States v. Ramos,* 861 F.2d 461, 466 (6th Cir.1988) (holding that the court had complied with *Remmer* where it had excused a juror but not interrogated the remaining jurors, where the excused juror's wife had conversed with one of the defendants and his wife while in a witness room).

Cordell has not advanced any evidence of prejudice to his right to an impartial jury other than his generalized contention that Juror # 8's presence in the jury box during closing arguments and jury instructions somehow tainted the remaining jurors. Absent proof or documentation of prejudice, we do not assume that prejudice occurred. *See United States v. Copeland,* 51 F.3d 611, 613–14 (6th Cir.1995) (applying abuse of discretion review to district court's decisions with regard to alleged juror misconduct and noting that, with respect to two of the three alleged instances, "the defense failed to show that any . . . bias occurred").

There was no demonstrated plain error or prejudice in the district court's treatment of Juror 8. Cordell's argument on this issue fails accordingly.

We find no merit in any of Cordell's assignments of error, and we thus affirm Cordell's conviction and sentence in this case.

## III. MAXWELL

### A. SUFFICIENCY OF EVIDENCE

■ Maxwell first argues that there was insufficient evidence to support his conviction for drug offenses. The standard for evaluating claims that a conviction is not supported by sufficient evidence presents a very difficult hurdle for the criminal appellant, such as Maxwell. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *see also United States v. Elder,* 90 F.3d 1110, 1120 (6th Cir.1996) (*citing Jackson* for the same proposition), *cert. denied,* —— U.S. ——, 117 S.Ct. 529, 136 L.Ed.2d 415 (1996) and —— U.S. ——, 117 S.Ct. 993, 136 L.Ed.2d 873 (1997).

■ Upon examination of the record, we find that there was ample evidence supporting Maxwell's conviction. He had access to the apartment where the officers discovered drugs, drug money, and drug paraphernalia; he possessed keys to the doors of the apartment and to the apartment's mailbox. Bowens testified that he would go to Maxwell's apartment to pick up drugs, and that Maxwell was usually there when Bowens came by. Bowens also testified that he was present when Cordell and Maxwell were processing cocaine into crack. Maxwell argues that the officers never questioned the landlord of Maxwell's apartment to determine the lessee of the apartment, that Maxwell's fingerprints were not recovered from any of the items seized from his apartment, and that Maxwell generally lacked "constructive possession of the apartment where the unlawful acts took place." Taking the evidence in the light most favorable to the prosecution, however, Bowens' testimony, the fact that Maxwell had keys to the apartment, and his presence at the scene where the contraband was found

**1078**

constitute sufficient evidence on which to base his conviction. This principal appellate argument thus lacks merit.

### B. *JURY INSTRUCTION*

Maxwell also alleges, almost in passing, that the district court erred by not reading Sixth Circuit Jury Instruction 3.03 on the law of conspiracy in its entirety. Maxwell claims that the court did not read the following passage from that instruction: "Similarly, just because a defendant may have done something that happened to help a conspiracy does not necessarily make him a conspirator." Maxwell's allegation, however, is inaccurate. The district court did include this sentence in its instructions to the jury. We find no merit in Maxwell's contentions.

### IV. *CONCLUSION*

For the foregoing reasons, we **AFFIRM** both the convictions and the sentences in this case.