*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0070p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

THOMAS J. WINKLE,

        *Defendant-Appellant.*

No. 04-4196

>

Appeal from the United States District Court
for the Northern District of Ohio.
No. 03-00773—David A. Katz, District Judge.

Argued: January 22, 2007

Decided and Filed: February 21, 2007

Before: SILER, MOORE, and ROGERS, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Christopher Carl Esker, BUCKINGHAM, DOOLITTLE & BURROUGHS, Akron, Ohio, for Appellant. David O. Bauer, ASSISTANT UNITED STATES ATTORNEY, Toledo, Ohio, for Appellee. **ON BRIEF:** Christopher Carl Esker, BUCKINGHAM, DOOLITTLE & BURROUGHS, Akron, Ohio, for Appellant. Thomas A. Karol, ASSISTANT UNITED STATES ATTORNEY, Toledo, Ohio, for Appellee.

_____

**OPINION**

_____

ROGERS, Circuit Judge. Thomas Winkle appeals his convictions and sentence for bank fraud and conspiracy to commit bank fraud. Winkle's convictions stem from a check kiting scheme between Winkle and co-defendant Steven Myers. On appeal, Winkle argues that (1) there was insufficient evidence of intent to support his convictions; (2) the district court abused its discretion in allowing an unqualified expert to give his opinion on an ultimate issue; (3) the district court abused its discretion in refusing to admit a report from the Federal Reserve; (4) he was denied the effective assistance of counsel; (5) he was sentenced by a judge who did not preside over his trial in violation of Rule 25 of the Federal Rules of Criminal Procedure; and (6) he is entitled to resentencing under *United States v. Booker*, 543 U.S. 220 (2005).

We affirm Winkle's convictions and sentence. The evidence presented at trial was more than sufficient to support Winkle's convictions and the district court's evidentiary rulings were not abuses of discretion. Winkle has waived any argument that the sentence imposed was unreasonable

1

and the sentencing court did not abuse its discretion in sentencing Winkle, despite any technical violation of Rule 25. We decline to address Winkle's ineffective assistance of counsel claim.

## I.  Background

### A.  The Check Kiting Scheme[1]

Winkle's convictions arose from a check kiting scheme conducted by Winkle and co-defendant Steven Myers. Winkle was the owner of Winkle Chevrolet Oldsmobile Pontiac (WCOP) and Myers was part owner of Steve Myers Auto Sales (SMAS). WCOP maintained a business checking account at the Oakwood Deposit Bank Company in Oakwood, Ohio. SMAS maintained its business checking account at Liberty National Bank in Kenton, Ohio. Winkle and Myers attempted to use fake dealer trades[2] as a means of disguising their check kiting scheme, and eventually the trades were only on paper, with Winkle and Myers exchanging only checks.

The basic mechanics of the scheme involved dealer trade sheets. Rather than simply exchanging checks for $100,000, for example, Myers and Winkle would use dealer trade sheets showing a Vehicle Identification Number and a corresponding price, making it look as though they were engaged in a dealer trade. Myers would provide a dollar figure to his employee, Patsy Heilman, who would then draw up the dealer trade sheet. The number of cars "traded" would depend on the total amount of money to be exchanged ("trading" five cars with a value of $20,000 to reach $100,000, for example). The same cars would be "traded" over and over again. For example, one truck was traded a total of 119 times, with 95 of those trades occurring after the specific truck had been transferred to another dealership in a legitimate dealer trade, and another truck was traded a total of 193 times, with 181 of those trades occurring after the transfer of the truck to another dealership in a legitimate trade.

Once Myers and Winkle wrote the checks, a runner from SMAS would facilitate the exchange of the checks and then Winkle and Myers would deposit the checks in their respective bank accounts. Over the course of eleven months, Winkle deposited into WCOP's account at Oakwood over $140 million worth of checks from SMAS. Over the same period of time, Winkle wrote over 5,600 checks to SMAS totaling more than $145 million.

Liberty Bank discovered the check kite on November 19, 2001, after receiving checks for payment that were written from the SMAS account and deposited into the WCOP account at Oakwood. Checks for $1.9 million were returned to Oakwood after Liberty stamped them as uncollected funds. Over the course of one week, Liberty returned to Oakwood checks totaling several million dollars. Liberty Bank then put a hold on the SMAS account, meaning that funds from the WCOP checks deposited into the SMAS account would not be made available until the funds behind those checks were collected. Liberty put a stop to the kite by refusing to let SMAS access its deposits, meaning it could not write checks.

---

[1] "'Kiting' occurs when accounts are maintained in different banks and checks are drawn on one account and deposited in the other when neither account has any substantial funds in it to pay the checks drawn on it. Since it takes several days to collect a check, each of the accounts will show substantial credits of uncollected checks, and those credits will continue so long as checks continue to be drawn every day in each bank and deposited in the other bank. If some checks are drawn to cash or to legitimate third parties, the checks that flow between the two banks have to be increased to maintain the 'kiting' equilibrium." *United States v. Street*, 529 F.2d 226, 229 (6th Cir. 1976) (quoting *United States v. Giordano*, 489 F.2d 327, 329 (2d Cir. 1973)).

[2] A legitimate dealer trade occurs when Dealership 1 has a customer who wants a specific car that the dealership does not have in its inventory. In such a case, Dealership 1 will contact Dealership 2, a dealership with that specific car in its inventory, and arrange to swap cars. Dealership 1 and Dealership 2 will then swap the cars along with checks to cover the invoice price of the cars.

Following his troubles with Liberty, Myers attempted to keep the kite going by using an SMAS employee's account at the Durez Credit Union. Over $4 million worth of checks drawn from WCOP's account at Oakwood were deposited into the Durez account. Checks totaling $3 million were written from the Durez account and deposited into the WCOP account at Oakwood.

**B. Discovery of Check Kiting Scheme Leads to Uncovering of Embezzlement by Steven Miller**

Unfortunately for Oakwood, the bank's CEO, Steven Miller, was embezzling from Oakwood. It was the check kiting scheme that led to the discovery of Miller's embezzlement. When Liberty began returning checks to Oakwood in November 2001, Oakwood became overdrawn and was forced to borrow from the Federal Reserve three times over the course of four days. This amount of borrowing activity raised red flags because it was unusually high. Jason Tarnowski, chief enforcement officer of the Federal Reserve Board, went to Oakwood to meet with Miller and discuss his concerns. Tarnowski reviewed Oakwood's records of the WCOP account. In examining WCOP's tax return for 2000 and related bank records, Tarnowski thought it odd that WCOP had total receipts in 2000 of $35.2 million and checking account activity in October 2001 of over $43 million. Tarnowski examined the WCOP account activity and determined that a check kite was occurring between the WCOP account at Oakwood and the SMAS account at Liberty. At the time, Tarnowski estimated the loss from the check kite at $5.8 million, a loss large enough to cause Oakwood to fail. Tarnowski and other agents with the Federal Reserve and the State of Ohio met with Oakwood's Board of Directors, explaining to them the nature of the check kite and the potential loss to the bank. The WCOP account was thereafter subject to monitoring by the Federal Reserve, and Miller was sending daily and weekly reports to Tarnowski. During the time that Tarnowski was keeping an eye on the WCOP account, everything appeared normal—there were no overdrafts and no issues with uncollected funds. However, Miller stopped sending in the daily reports and Tarnowski made an unannounced visit to Oakwood on January 28, 2002. During this visit, Tarnowski discovered a $4.8 million transaction and the description of the transaction indicated that it involved Winkle checks. Upon the discovery of other unexplained transactions, Miller eventually confessed to embezzling $40 million from Oakwood. Oakwood closed February 1, 2002. Eventually it was determined that Miller cooked the books in December in an attempt to make the WCOP account appear normal. In Tarnowski's opinion, there was no connection between the Miller embezzlement and the check kiting scheme until Miller's actions in December 2001.

**C. Trial, Conviction, and Appeal**

Myers and Winkle were indicted for conspiracy to commit bank fraud (Count 1) and bank fraud (Count 2), in violation of 18 U.S.C. §§ 371 and 1344. Myers pleaded guilty before going to trial. Winkle's trial began on May 11, 2004. On that same day, the case was assigned to Judge Potter, although Judge Katz had been presiding over the case prior to trial. The record does not show that either party objected to the assignment of the case to Judge Potter for trial.

Following a three-day trial, a jury convicted Winkle on both counts. On August 5, 2004, the case was assigned to Judge Katz for sentencing. The record does not show that either party objected to the return of the case to Judge Katz. Judge Katz conducted the sentencing hearing on September 10, 2004, and sentenced Winkle to 60 months on Count 1 and 78 months on Count 2, with the sentences to run concurrently. Judge Katz also imposed a three-year term of supervised release and ordered restitution in the amount of $8,054,000. Winkle was sentenced under the then-mandatory Sentencing Guidelines. At the Government's request, Judge Katz imposed an alternative, identical sentence in the event the Sentencing Guidelines were struck down.

Winkle filed a timely notice of appeal.

## II. Analysis

### A. Sufficiency of the Evidence

Winkle's argument that there was insufficient evidence to convict him is without merit because the evidence adduced at trial was sufficient to permit a rational trier of fact to find Winkle guilty beyond a reasonable doubt. "The standard for evaluating claims that a conviction is not supported by sufficient evidence presents a very difficult hurdle for the criminal appellant . . . ." *United States v. Maxwell*, 160 F.3d 1071, 1077 (6th Cir. 1998). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The evidence presented at trial was more than sufficient for the jury to conclude that Winkle possessed the requisite intent to defraud, notwithstanding Winkle's argument to the contrary. "'It must . . . be borne in mind that the question of intent is generally considered to be one of fact to be resolved by the trier of the facts . . . and the determination thereof should not be lightly overturned.'" *United States v. Daniel*, 329 F.3d 480, 487 (6th Cir. 2003) (quoting *United States v. Hopkins*, 357 F.2d 14, 18 (6th Cir.1966)).

Winkle argues that he was merely in an overdraft situation, that his bad checks were approved by Miller, and that he was duped by Myers into participating in the check kiting scheme. But these arguments were sufficiently refuted by circumstantial evidence. As we have repeatedly held, "[c]ircumstantial evidence alone is sufficient to sustain a conviction, and such evidence need not 'remove every reasonable hypothesis except that of guilt.'" *United States v. Brown*, 147 F.3d 477, 489 (6th Cir. 1998) (quoting *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996)). In particular, as the Seventh Circuit has explained, "[b]ecause direct evidence of a defendant's fraudulent intent is typically not available, specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself which demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Yoon*, 128 F.3d 515, 523-24 (7th Cir. 1997) (internal quotation marks omitted).

Winkle testified that Miller assured him that Winkle's checks would be covered and that he was acting at the direction of Myers because Myers needed a loan. However, he admitted that he never had a line of credit at Oakwood worth more than $500,000. He also admitted that the checks he wrote from the WCOP account to SMAS would not have been good had he not been getting checks from SMAS to deposit into the WCOP account.

The jury heard testimony from former WCOP employees Carla Shaffer and Tasha Panico. Shaffer described the check kiting scheme and testified that Winkle would give her the dealer trade sheet faxed over from SMAS and instruct her to write checks in individual amounts corresponding to the cost of a car listed on the dealer trade sheet. She testified that WCOP did not actually have many of the cars listed on the dealer trade sheets in stock. Winkle would sign the checks and put them in an envelope so that they could be sent to Myers at SMAS. According to Shaffer, WCOP would not have had enough money to cover its expenses if it were not for the deposits from SMAS. Former WCOP employee Panico testified similarly to Shaffer.

Patsy Heilman, a former employee of SMAS, testified that she prepared the dealer trade sheets that were used to facilitate the swapping of the checks and that Myers would fax the sheet over to Winkle. Heilman testified that, towards the end of the scheme, checks would be going back and forth between WCOP and SMAS twice a day and that, when Liberty Bank placed a hold on the

SMAS account, Myers and Winkle attempted to continue the check kite by using the account of an SMAS employee at the Durez Credit Union.

Karen Dietrick, an employee at Oakwood, testified that, to her knowledge, no one at Oakwood ever approved of an exchange of checks between WCOP and SMAS.

Winkle does not attack the testimony of these witnesses, but rather points to the testimony of several witnesses regarding overdrafts in support of the contention that he was merely in an overdraft situation that was approved of by Miller. However, Winkle's argument fails given that these same witnesses distinguished an overdraft from a check kite. William Carr of Liberty Bank testified that a check kite and an overdraft are not the same thing, and that a check kite is against the law. Tarnowski also testified regarding the differences between an overdraft and a check kite, stating that there were no circumstances under which a check kite would be legitimate. Similarly, Christopher Boyd, the Government's expert witness, testified that banks may not permit check kites, although they may allow a customer to overdraft an account.

The evidence presented was sufficient for the jury to conclude that Winkle possessed the requisite intent to defraud and was not merely duped by Myers or in an overdraft situation approved of by Miller.[3] Myers and Winkle exchanged thousands of checks totaling more than $140 million. Winkle himself admitted that the checks he wrote would not have been honored had he not been receiving checks from SMAS. The evidence of Winkle's intent was not insufficient merely because Winkle testified that he had no intent to defraud.

### B. Knowingly or Willfully Conspiring with Myers

Winkle also makes a distinct argument on appeal that there was not sufficient evidence that he knowingly or willfully conspired with Myers. However, because Winkle's attorney moved for a judgment of acquittal only on the ground that there was insufficient evidence that Winkle intended to defraud, and did not raise the issue of intent to conspire, this ground was waived. As we explained in *United States v. Chance*, 306 F.3d 356, 369 (6th Cir. 2002), "[a]lthough specificity in a Rule 29 motion is not required, where the defendant makes a Rule 29 motion on specific grounds, all grounds not specified in the motion are waived."

Even if this ground were not waived, Winkle's argument lacks merit. "In order to show a conspiratorial agreement, only a tacit understanding among the participants is required." *United States v. Hamilton*, 263 F.3d 645, 652 (6th Cir. 2001), and "a defendant's knowledge of and participation in a conspiracy may be inferred from his conduct and established by circumstantial evidence," *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005). There was more than sufficient evidence to support a conclusion that Winkle willfully conspired with Myers. As noted previously, there were thousands of checks involved and Winkle admitted to writing those checks knowing that he did not have the funds to cover them. The jury was presented with sufficient evidence to conclude that Winkle willfully conspired with Myers.

---

[3]Furthermore, even if the jury found that Miller approved of Winkle's actions, the victim of a bank fraud is the bank, not the CEO of the bank, and approval of a bank officer does not relieve a defendant of liability for bank fraud. *United States v. Abboud*, 438 F.3d 554, 593 (6th Cir. 2006); *see also United States v. Knipp*, 963 F.2d 839, 846 (6th Cir. 1992) (holding evidence sufficient to support the conviction of a bank officer where the jury could conclude that he facilitated the check kiting scheme of a customer).

**C. Evidentiary Rulings**

*1. Boyd was Qualified to Testify as an Expert*

Because Christopher Boyd was qualified, the district court did not abuse its discretion in permitting Boyd to testify as an expert. Boyd is an employee of Thompson Cobb, the accounting firm hired by the FDIC to investigate the WCOP and SMAS transactions. Boyd was the on-site manager of the team conducting the investigation, a position entailing supervising the staff, acting as a liaison with the FDIC, compiling data, and preparing the final report. Winkle objected to Boyd's testimony on the ground that the work Thompson Cobb did on behalf of the FDIC in investigating the transactions between WCOP and SMAS was an audit and that only a certified public accountant can conduct and present an audit. Winkle's attorney suggested that he be allowed to voir dire Boyd outside the presence of the jury. The district judge responded that he would "hate to send the jury out. I think you can do it on cross." Winkle's attorney responded "Okay," and the objection was overruled.

Federal Rule of Evidence 702 supports the admissibility of Boyd's testimony. That rule provides that expert testimony is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue" and if the witness is "qualified as an expert by knowledge, skill, experience, training, or education." Boyd testified that he received his bachelor's degree in business from the University of Maryland and that he worked for five years for the Office of the Comptroller of the Currency as a bank examiner, work that involved conducting examinations of banks to determine their soundness as financial institutions. He held various positions in the field of commercial banking and, for the twelve years prior to Winkle's trial, had worked for the accounting firm of Thompson Cobb. At Thompson Cobb, Boyd had conducted due diligence reviews for the Resolution Trust Corporation and compliance reviews for the Small Business Administration. Boyd testified that, as a bank examiner, he was taught how to spot check kiting activity and that part of his job was to ensure that the banks he examined had controls in place to monitor for check kiting.

Although Winkle is correct that Boyd is not a CPA, Winkle does not argue that the report *itself* was faulty because Boyd was not a CPA or that the methods used by Boyd's team were unreliable. Nor has Winkle come forward with a decision of any court limiting the testimony of experts in bank fraud or similar cases to CPAs, and a review of the case law reveals no such cases. Based on Boyd's background in the banking industry and his training with regard to check kiting, it was not an abuse of discretion for the district court to allow Boyd to testify as an expert. *See, e.g.*, *Abboud*, 438 F.3d at 587 (allowing an FBI agent to give expert testimony regarding check kiting was not error); *Yoon*, 128 F.3d at 527 (same).

*2. It Was Not Error to Allow Boyd to Offer His Opinion as to an Ultimate Issue*[4]

Winkle's argument that it was error to allow Boyd to offer an opinion that a check kite had occurred fails because Boyd did not offer an opinion regarding Winkle's state of mind and his testimony was otherwise admissible. When asked whether he had formed an opinion as to what had occurred between WCOP and SMAS, Boyd testified, over Winkle's objection, that he concluded that a check kite had occurred. Winkle's argument on appeal is that the trial court erred in allowing

---

[4]We note that the issue of the admissibility of Boyd's testimony is not listed in the Statement of Issues Presented for Review in appellant's brief, notwithstanding the requirement of Federal Rule of Appellate Procedure 28(a)(5). In addition, the section of Winkle's brief addressing evidentiary issues contains almost no citation to legal authority from this or any other court; cases are cited only in the standard of review discussion.

a non-qualified expert to give ultimate opinion testimony and that this "resulted in an unfair and highly prejudicial message to the jury regarding Mr. Winkle's guilt."[5]

Rule 704(a) of the Federal Rules of Evidence supports the admissibility of Boyd's opinion. That rule provides that, other than expert opinions regarding the mental state of the defendant, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

Boyd's testimony was "otherwise admissible" under Rule 704(a). *See Hefflin v. Stewart County*, 958 F.2d 709, 715 (6th Cir. 1992). Rule 702 provides that expert testimony is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Given the complexity of the check kiting scheme and the fact that the general public may not be aware of the mechanics of such a scheme, Boyd's testimony was admissible under Rule 702. The check kiting scheme involved thousands of checks disguised as normal business transactions. Tarnowski testified that he had to tell the Board of Directors of Oakwood what a check kite was, indicating that such a scheme would not be something within the normal experience of the members of the jury. This case is no different from cases in which we have held, for purposes of Rules 702 and 704, that methods and techniques regarding drug distribution are not generally within the general knowledge of a layperson. *E.g.*, *United States v. Combs*, 369 F.3d 925, 940 (6th Cir. 2004).

Nor was Boyd's testimony inadmissible on the ground that Boyd impermissibly testified regarding Winkle's state of mind. Boyd did not state that Winkle intended to defraud or that he thought Winkle was guilty of any crime. He merely offered an opinion regarding what the facts alleged added up to. Thus, his conclusion that a check kite had occurred did not invade the province of the jury and the jury was left to determine whether Winkle had the requisite intent to defraud. This conclusion is supported by decisions from other circuits. The Seventh Circuit in *Yoon* upheld the admissibility of expert testimony by an FBI agent that the transactions in question amounted to check kiting. 128 F.3d at 527. The Ninth Circuit held in *United States v. Gordon*, 117 Fed. Appx. 501, 503 (9th Cir. 2004), that it was not an abuse of discretion to allow an expert to testify regarding his opinion that the defendant's activity was consistent with check kiting when the witness did not comment on the defendant's mental state and the testimony did not necessarily compel the conclusion that the defendant had the required mental state. The Tenth Circuit in *United States v. Oles*, 994 F.2d 1519, 1523 n.2 (10th Cir. 1993), noted that the "ultimate issue" of law was whether the defendants engaged in bank fraud, not whether they engaged in check kiting.

Our conclusion is also supported by cases permitting expert testimony regarding different but comparable types of criminal activity. For instance, in *United States v. Glover*, 265 F.3d 337, 344-45 (6th Cir. 2001), we held that an expert could testify regarding his opinion that a car was manufactured outside the state where it was sold where an essential element of the crime was movement of the vehicle in interstate or foreign commerce. In *United States v. Monus*, 128 F.3d 376, 386 (6th Cir. 1997), we held that expert testimony of an IRS agent regarding tax liability did not usurp the function of the jury because the agent did not give his opinion about the guilt of the defendant. And in *United States v. DeClue*, 899 F.2d 1465, 1473 (6th Cir. 1990), we held that an IRS agent did not usurp the function of the jury in a tax evasion case where the agent did not give her opinion about the guilt or innocence of the defendant, but rather gave her opinion about whether tax was due and owing.

---

[5] Although Winkle states in his brief that the district court's erroneous evidentiary rulings affected the jury charge and that the erroneous jury charge supports vacating his conviction, Winkle has waived any argument related to faulty jury instructions. The jury charge issue is not mentioned again in Winkle's brief nor is the charge to the jury included in either Winkle's brief or in the Joint Appendix.

Although Winkle appears to argue that it was unfairly prejudicial to allow Boyd to testify regarding his opinion that a check kite had occurred, this argument also lacks merit. Rule 403 provides that relevant evidence can be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice." Our review of a determination under Rule 403 is limited and we "must look at the evidence in 'the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect.'" *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir. 1993) (quoting *United States v. Zipkin*, 729 F.2d 384, 389 (6th Cir. 1984)). Although Boyd's testimony may have hurt Winkle's case, nothing in Boyd's testimony remotely suggests an improper basis for the jury's decision. As we have explained, "[u]nfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest a decision on an improper basis." *Id.* (internal quotation marks omitted). Thus, Boyd's testimony was not unfairly prejudicial and the district court did not abuse its discretion by allowing it.

### 3. The District Court Properly Refused to Admit FDIC Report[6]

The district court did not abuse its discretion by refusing to admit into evidence a report from the Office of the Inspector General of the Federal Reserve because, even if the report was relevant, its slight probative value was substantially outweighed by the danger that its admission would confuse the jury. The report addressed the failure of Oakwood, and in particular the failure of regulators to detect Miller's years-long embezzlement scheme. Winkle's attorney was permitted, over the Government's objection, to question Tarnowski about the report, specifically, a statement in the report that Miller allowed the check kite to continue in order to avoid detection of his own embezzlement. Tarnowski responded that the report was early in the investigative process and that he questioned the accuracy of some of the statements in the report.

When Winkle attempted to admit the report into evidence, the Government objected because the authors of the report were not questioned regarding statements made in the report, the report was not relevant because it was written early in the investigation, and the report was likely to confuse the jury because it shed no light on the check kite. The district court sustained the Government's objection, stating that there was "so much in [the report]" and that defense counsel had the opportunity to cross-examine Tarnowski regarding the conclusions in the report.

The relevant statements in the report are (1) "Oakwood failed because of losses attributed to the check kiting scheme allegedly facilitated by Miller and embezzlements allegedly committed by him," and (2) "FRB Cleveland staff [said] that Miller allowed the check kite to operate and continued to pay on uncollected funds to avoid unwanted attention from bank examiners." Although Winkle maintains that it was error to refuse to admit the report because the report "minimized Mr. Winkle's involvement, and instead pointed the causative finger at Miller, Myers, and the Federal Reserve," this characterization of the report is seriously misleading. The report focused on the failure to detect Miller's embezzlement and did not provide specific or detailed information about the check kiting scheme. The report did not mention Myers by name, let alone "point[] the causative finger" at him, nor did it in any way minimize Winkle's involvement.

Winkle fails to refer this court to any law or relevant rule of evidence that lends support to his contention that the district court abused its discretion in refusing to admit the report into evidence. Assuming that Winkle's argument is that the report was relevant and thus should have been admitted because the probative value of the report was not substantially outweighed by any danger of confusing the jury, such an argument fails. The relevance of the report is questionable

---

[6]As with the issue of the admission of Boyd's testimony, the issue of the exclusion of the FDIC report is not listed in the Statement of Issues Presented for Review notwithstanding the requirement of Federal Rule of Appellate Procedure 28(a)(5).

given that its focus was on Miller's embezzlement and the failure of regulators to catch on to Miller's crimes. Even assuming that the report was slightly relevant to an issue in the case, it was properly excluded under Federal Rule of Evidence 403 if its probative value was "substantially outweighed by the danger of . . . confusion of the issues, or misleading the jury." Because the report shed no light on the involvement of Winkle or Myers in the check kiting scheme and only briefly mentioned the check kiting scheme, there was a danger of confusing the jury by presenting it with information about an entirely different crime in an already complicated case. Thus, the district court did not abuse its discretion when it sustained the Government's objection to the admission of the report.

Finally, even if the district court erred in refusing to admit the report, such error was harmless given the overwhelming evidence against Winkle from the Government's witnesses and from Winkle himself, who admitted to writing thousands of checks for millions of dollars knowing that he did not have adequate funds to cover those checks. Furthermore, Winkle's attorney was permitted to cross-examine Tarnowski about the conclusion in the report that Miller allowed the check kiting scheme to continue and thus the jury was made aware of the relevant statements in the report.

### D. Alleged Sentencing Errors

*1. Assignment of Sentencing to Judge Katz*

Winkle's argument that he is entitled to a new trial or resentencing fails because, even assuming a technical violation of Rule 25 of the Federal Rules of Criminal Procedure, Winkle's only available remedy would be the same as the error complained of—sentencing by a judge who did not preside over his trial[7]—and because Judge Katz did not abuse his discretion in sentencing Winkle.

Winkle's case was originally assigned to Judge Katz, but was then assigned to Judge Potter for trial. Following the guilty verdict, Winkle's case was returned to Judge Katz for sentencing. According to the Government, Judge Katz was presiding over another criminal trial at the time Winkle's case was set for trial, explaining the transfer of the case to Judge Potter. There is no information, however, regarding the reasons for the transfer of the case back to Judge Katz for sentencing. The record does not reveal that Winkle objected either to the assignment of the case to Judge Potter for trial or to the reassignment of the case to Judge Katz for sentencing.

Because no explanation has been provided regarding the reason for the transfer of the case to Judge Katz for sentencing, it is not possible to determine on the record before us whether the transfer was in violation of Rule 25(b)(1), which provides that, following a guilty verdict, "any judge regularly sitting in or assigned to a court may complete the court's duties if the judge who presided at trial cannot perform those duties because of absence, death, sickness, or other disability." Rule 25(b)(2) provides that the successor judge *may* grant a new trial where he is satisfied that "a judge other than the one who presided at the trial cannot perform the post-trial duties; or . . . a new trial is necessary for some other reason."

Despite any technical violation of Rule 25 that may have occurred, remand is unnecessary for several reasons. First, a remand *solely* because of a technical violation of Rule 25 is unwarranted, especially where there was no objection made to the transfer of the case. Second, if the technical violation of Rule 25 alone was sufficient to result in remand, the remedy in this case would be the harm complained of: because of Judge Potter's retirement, it is not possible for Winkle to be sentenced by the judge who presided over his trial. Finally, there is nothing in the record

---

[7]Judge Potter closed his chambers and retired on September 30, 2004.

indicating that Judge Katz abused his discretion in sentencing Winkle, and Winkle cannot establish that any error in transferring the case to Judge Katz resulted in any harm.

A successor judge's determination that he is familiar enough with the case to proceed with sentencing will often be an implicit one. *See United States v. Casas*, 356 F.3d 104, 128 (1st Cir. 2004). Judge Katz reviewed the presentence report and read thirty-four letters written on Winkle's behalf. *See United States v. Makes Room*, 49 F.3d 410, 416 (8th Cir. 1995) ("A sentencing judge may properly rely upon the presentence investigation report."). He presided over the case until the eve of trial. He took the plea of Winkle's co-conspirator Steve Myers and sentenced him, and presided over the Government's case against Miller, the CEO of Oakwood. *See id.* at 415 ("A sentencing judge may . . . consider evidence introduced during proceedings involving codefendants."). A successor judge's determination that he is sufficiently familiar with the record to proceed with sentencing is reviewed for an abuse of discretion. *Casas*, 356 F.3d at 128; *United States v. Morgan*, Nos. 96-1632/96-1711, 1997 U.S. App. LEXIS 18189, at *13 (2d Cir. May 21, 1997); *Makes Room*, 49 F.3d at 416; *United States v. Bourgeois*, 950 F.2d 980, 988 (5th Cir. 1992). Although Judge Katz did not go on the record at sentencing and recite everything he knew about the case and how he had familiarized himself with the case, we cannot say he abused his discretion in sentencing Winkle given Judge Katz's involvement in the case and his familiarity with the presentence report.

Winkle refers us to the Eleventh Circuit's decision in *United States v. McGuinness*, 769 F.2d 695 (11th Cir. 1985), to support his contention that he is entitled to a new trial or resentencing. However, the successor judge in that case affirmatively stated that he was not familiar with the transcript of the trial, and there was nothing else in the record to indicate that he was familiar with the case through other means. 769 F.2d at 696. Although the court in *McGuinness* remanded the case for resentencing, it refused to adopt a blanket rule that the record must, in every case, "affirmatively recite the sentencing judge's familiarity with the case." *Id.* at 696-97. As detailed above, the record supports the conclusion that Judge Katz was sufficiently familiar with Winkle's case that the decision to sentence Winkle was not an abuse of discretion.

### 2. *Arguments under* Booker

Winkle's argument that he is entitled to resentencing under *United States v. Booker*, 543 U.S. 220 (2005), fails because Judge Katz imposed an identical, alternative sentence in the event the Supreme Court held the mandatory application of the Guidelines unconstitutional. "[T]his court will not remand for *Booker* resentencing where the court below has expressly contemplated an advisory-only Guidelines regime and imposed an identical alternative sentence." *United States v. Till*, 434 F.3d 880, 886 (6th Cir. 2006).

Winkle does not argue in his brief that the sentence imposed was unreasonable. He merely states, without reference to any decision of this or any other court, that Judge Katz's statement that the sentence imposed would have been identical whether the Guidelines were mandatory or advisory "does not comport with either the directives of this Court or the directives of the Supreme Court." Winkle makes no reference to the factors outlined in 18 U.S.C. § 3553(a), nor does he claim that Judge Katz failed to consider the factors in imposing sentence. In Winkle's reply brief, the discussion of reasonableness focuses on the assignment of Judge Katz to sentencing, not on any failure of Judge Katz to apply the relevant § 3553(a) factors. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006). It would be generous to say that Winkle has even adverted to the reasonableness of his sentence, and any claim related to reasonableness is thus waived.

**E. Asserted Ineffective Assistance of Counsel**

Although Winkle maintains that the record is sufficient to support a claim of ineffective assistance of counsel, the actions of counsel referred to in the brief are merely conclusory statements and the record on this issue is not sufficiently developed for us to evaluate this claim. "Ineffective assistance claims are more properly raised in a post-conviction proceeding brought pursuant to 28 U.S.C. § 2255, where the record regarding counsel's performance can be developed in more detail. . . . This Court typically will not review a claim of ineffective assistance on direct appeal except in rare cases where the error is apparent from the existing record." *United States v. Lopez-Medina*, 461 F.3d 724, 737 (6th Cir. 2006) (citation omitted).

Because any error is not apparent from the record before us, we decline to address Winkle's claim of ineffective assistance of counsel.

### III. Conclusion

For the foregoing reasons, we affirm Winkle's convictions and sentence.