NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0299n.06

**No. 11-5716**

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | ***Mar 26, 2013*** |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| CHARLES A. McKUHN, JR., | ) | WESTERN DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |

Before:  GILMAN, ROGERS and SUTTON, Circuit Judges.

SUTTON, Circuit Judge.  After Charles McKuhn swindled several debt-ridden individuals out of their homes and several debt-ridden churches out of every last tithe in their collection plates, he paid a price of his own.  A jury convicted him of several fraud offenses, and a judge sentenced him to 210 months in prison and ordered him to pay $2.5 million in restitution.  We affirm the convictions and sentence.

I.

Even though McKuhn charmed people into parting with their money over false promises related to financial instruments rather than band instruments, his scheme was not complex—more Harold Hill than Bernie Madoff.  He would identify individuals struggling to make their monthly mortgage payments and promise he could reduce their debts for an upfront fee.  He added

sophisticated-sounding phrases and claims of access to his pitch with talk of "private banking," "diplomatic immunity" and "blanket bonds" from the Federal Reserve that would underwrite the payments. After his victims paid the upfront fee, McKuhn told them not to make any additional payments to their banks or to return any phone calls threatening sanctions. Then he disappeared, taking the debtors' fees with him and leaving the victims to face foreclosure, bankruptcy or both.

McKuhn initially preyed on people who had known him for years. He expanded his web by encouraging friends to introduce him to other acquaintances and eventually to their ministers. After tapping into a network of pastors, McKuhn identified several struggling congregations and convinced the church leaders to fork over fees, sometimes to secure a line of credit, sometimes to eliminate debt.

All told, 194 individuals and 22 churches suffered from the fraud. Many lost their homes, barely escaped foreclosure or were forced to declare bankruptcy. One church lost its building, and several others had to restructure their loan agreements and mortgages on less favorable terms. The total losses from the fraud exceeded $3.1 million.

After a three-day trial, in which McKuhn represented himself and presented no witnesses, a jury convicted him of two counts of mail fraud, four counts of wire fraud and one count of money laundering. *See* 18 U.S.C. §§ 1341, 1343, 1957. The district court sentenced him to 210 months in prison and ordered him to pay roughly $2.5 million in restitution.

II.

McKuhn first challenges the sufficiency of the prosecution's evidence, a challenge that often faces a steep climb given the requirement that we construe all reasonable inferences in favor of the government. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In this case, McKuhn's climb is steeper still because he failed to move for a judgment of acquittal within the fourteen-day window after the jury verdict. *See* Fed. R. Crim. P. 29(c)(1); *United States v. Charles*, 138 F.3d 257, 265–66 (6th Cir. 1998). When a defendant fails to make a timely motion for acquittal, he forfeits any sufficiency objection, and we must reject a subsequent challenge unless the record is so "devoid of evidence pointing to [his] guilt" that his convictions represent a "manifest miscarriage of justice." *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998).

The record is replete with evidence of McKuhn's guilt, so much so that his Rule 29 oversight makes no difference to the analysis. All that McKuhn challenges is the evidence of intent to defraud, which "may be established by circumstantial evidence" and inferences that suggest "the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Winkle*, 477 F.3d 407, 413 (6th Cir. 2007) (internal quotation marks omitted). The government had no shortage of witnesses on this score. It put on eleven of them, and each testified that McKuhn beguiled them with sophisticated-sounding explanations of his ability to reduce debt, persuaded them to write sizeable checks to him, then took off with the money. The evidence showed that McKuhn focused on the vulnerable: individuals and churches in dire fiscal straits. Lest there was any doubt about the credibility of the victims' testimony, McKuhn's bank statements confirmed the payments

he received from them. McKuhn did not offer any witnesses of his own or for that matter any exculpatory evidence. The evidence of guilt was overwhelming, and accordingly McKuhn's sufficiency challenge must fail.

### III.

McKuhn also challenges a statement the district judge made to the jury during McKuhn's closing argument. Throughout the trial, McKuhn attacked the debtors' credibility by referencing "nondisclosure agreements" he had allegedly convinced them to sign and suggesting that the witnesses could not be trusted because they failed to honor these "contracts" by testifying at trial. *See, e.g.*, R.123 at 505. When McKuhn alluded to one of these contracts during his closing argument, the prosecution and district court intervened:

> THE DEFENDANT: Ms. Clark's responsibility, according to the contract that she agreed that she signed on is that she would forward a copy of—
>
> MR. HENRY: I'm going to object, Judge, this contract that he's speaking of is not in evidence.
>
> THE DEFENDANT: This is testimony.
>
> THE COURT: A document that is equally available to both sides, you can draw any inference from that. Secondly, this is not a contract case. It just—it doesn't matter what's in these documents. The question is whether or not the government has proven each element beyond a reasonable doubt, so it is not a contract case. That would be a civil case, it would be different.

*Id.* at 506–07. To McKuhn's way of seeing things, this "instruction" to the jury in the midst of his closing argument "substantially impaired his right to a fair trial." McKuhn Br. at 20.

That is not how we see it. As the government pointed out, the contract to which McKuhn alluded was not in the record, nor was it a relevant means of assessing McKuhn's guilt. In the face of an objection premised on these legitimate considerations, the district court properly stopped McKuhn from marching farther down this road. *See United States v. Sheffey*, 57 F.3d 1419, 1430 (6th Cir. 1995).

IV.

McKuhn also challenges the procedural and substantive reasonableness of his sentence. He makes three arguments, but none gets off the ground.

*First*, McKuhn challenges the district court's loss calculation, which we may set aside only if it is clearly erroneous. *United States v. Erpenbeck*, 532 F.3d 423, 433 (6th Cir. 2008). A district court's loss calculation need only be a "reasonable estimate," U.S.S.G. § 2B1.1 cmt. 3(C), and the district judge's $2.5 million figure—a conservative $600,000 less than the $3.1 million loss outlined in the presentence report—satisfied this modest requirement. The sentencing record contains a panoply of victim-impact statements and charts tallying the losses of churches and individuals. Reasoning that there was "no real doubt about the scale of the losses" and that the restitution amounts were "not being contested," the district judge explained that he was "not going to articulate" each individual amount unless someone "want[ed him] to." R.124 at 55. McKuhn apparently did not want him to. He raised no objections to any particular loss figure put forward in the presentence report, even when the district judge prompted him for specificity. *See* R.124 at 55. The court

considered McKuhn's blanket objection to the presentence report and his protests about the victim statements' credibility but concluded that "the evidence . . . clearly support[ed] the propositions that [were] advanced in the report." R.124 at 55. We see no reason to second guess that finding, nor can we identify any clear errors in the district court's computations.

On appeal, McKuhn for the first time identifies two potential overstatements in the presentence report—an alleged failure to account for one victim's equity in a church property and an exaggerated loss amount by an allegedly unreliable witness. No error, much less a plain error, occurred. McKuhn did not raise either of these examples before the district court, and he provides no estimate of the actual losses caused, citing only the fair market value of the two properties. That does not suffice to reverse his sentence.

*Second*, McKuhn contends that the district judge impermissibly considered a non-§ 3553(a) factor when he said:

> The sentence also needs to afford deterrence to others committing crimes like this. We often ask the question if an individual was told that they could have a certain amount of money, say, two million dollars, two and a half million dollars, three million dollars, what would they be willing to do, how much time would they be willing to spend in a federal prison to get that much money. It is important to think about it at least somewhat in that way, as well as in many other ways because deterrence means that the penalty has to be sufficient. The real penalty has to be sufficient to cause a person to say I would not commit the crime.

R.124 at 47–48. McKuhn takes issue with this articulation of the risk calculus a defendant considers before committing a crime. But this is simply another way of getting at deterrence, which of course

is one of the core § 3553(a) factors—"the need for the sentence imposed . . . to afford adequate deterrence." 18 U.S.C. § 3553(a)(2)(B).

*Third*, McKuhn argues that the court should not have ordered him to pay restitution because he will not be able to afford it. The court ordered McKuhn to pay restitution under the Victim and Witness Protection Act, 18 U.S.C. § 3663 *et seq.*, which instructs courts to consider "the amount of the loss sustained by each victim . . . , the financial resources of the defendant, the financial needs and earning ability of the defendant . . . , and such other factors as the court deems appropriate." *Id.* § 3663(a). A defendant's "indigency [is] but one factor for the court to consider." *United States v. Bondurant*, 39 F.3d 665, 668 (6th Cir. 1994). Even if McKuhn could not pay a fine, ordering restitution "would not necessarily be an abuse of discretion." *United States v. Sanders*, 95 F.3d 449, 456 (6th Cir. 1996). The district court may order restitution if it "finds that the defendant has a substantial probability of earning future income," and this finding may be based on the defendant's "intelligence, education, and employment record." *Id.* at 456–57. The district court expressly considered the § 3663 factors, R.124 at 42–44, and concluded that McKuhn "clearly [has] the ability to make substantial income, [and] has done so in the past," *id.* at 57. No abuse of discretion occurred on this record. *See United States v. Guardino*, 972 F.2d 682, 686 (6th Cir. 1992).

V.

For these reasons, we affirm.