

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

AP-76,036

---

Hector Rolando Medina, Appellant

v.

The State of Texas

---

Direct Appeal from Case F07-32923-S of the
282nd Judicial District Court of
Dallas County

---

WOMACK, J., delivered the opinion of the Court, in which KELLER, P.J., and
MEYERS, PRICE, KEASLER, HERVEY and COCHRAN, JJ., joined. JOHNSON, J., filed a
dissenting opinion.

After hearing uncontested evidence that Hector Medina killed his two children and then

shot himself in the neck, a jury convicted him of capital murder in September 2008. The trial

court sentenced the appellant to death pursuant to the jury's answers to future-dangerousness and

mitigation special issues.[1] The appellant now raises fifty-three points of error on direct appeal to

---

[1]TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(1), (e)(1).

this Court.[2] Finding no reversible error, we shall affirm the judgment and sentence of the trial court.

## I. *Batson* Complaints

In his first eight points of error, the appellant argues that the prosecution struck seven venire members because of their race, in violation of the equal protection guarantees in the 14th Amendment to the Federal Constitution.[3]

## A. Standard of Review

The three steps of a *Batson* hearing are well-known. First, the opponent of a peremptory strike must make out a prima facie case of racial discrimination. Second, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation. Third, the trial court determines whether the opponent of the strike has proved purposeful racial discrimination. The burden of persuasion rests with, and never shifts from, the opponent of the strike.[4]

The determination of whether the proponent's explanation is a pretext "is solely a question of fact; there is no issue of law."[5] Because the trial court's fact finding will be based on factors not evident in the record, such as the lawyers' courtroom demeanor and credibility, a

---

[2] *See id.*, at § 2(h) ("The judgment of conviction and sentence of death shall be subject to automatic review by the Court of Criminal Appeals.").

[3] *See Batson v. Kentucky*, 476 U.S. 79 (1988); *see also Powers v. Ohio*, 499 U.S. 400, 415-16 (1991) (granting defendants standing to raise equal-protection claims regardless of whether they are of the same race as the stricken panelists).

[4] *Purkett v. Elem*, 514 U.S. 765, 767 (1995).

[5] *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Cr. App. 2004).

reviewing court will give great deference to the fact finding and reverse only if the finding was clearly erroneous.[6]

## B. Appellant's Claims

The appellant objected to the prosecution's use of its peremptory challenges on seven venire members. The trial court held a single *Batson* hearing for all seven claims. For six venire members, the trial court found a prima facie case of discrimination, but then found the State's race-neutral reasons believable. For the one remaining venire member, who the State and trial court did not believe was a member of a racial or ethnic minority, the trial court overruled the defense objection without requiring the prosecutor to give a race-neutral reason.

For the strikes of venire members Jordon, Munoz, Syed, Youngblood, and Santos, the appellant presents no rebuttal to the prosecution's race-neutral reasons. Jordan was 24 years old, and the state did not believe she had sufficient life experience to be a good juror on a death penalty case.[7] Venire member Munoz stated on his questionnaire that he would never return a verdict that assessed the death penalty.[8]

Venire member Syed expressed hostility to the death penalty in his questionnaire and during *voir dire*, and had attended anti-death-penalty concerts. Venire member Youngblood was uncertain whether killing a child under age six should be a capital offense. Venire member

---

[6] *Id.*

[7] The State also struck the only other venire member under 30, a white male. *See U.S. v. Maxwell*, 160 F.3d 1071, 1075-76 (6th Cir. 1998) (noting that the Supreme Court has never held that age is an illegitimate reason to strike jurors).

[8] *See Jasper v. State*, 61 S.W.3d 413, 422 (Tex. Cr. App. 2001) (venire member's responses to a written questionnaire can be valid grounds for a peremptory challenge).

Santos gave questionnaire answers expressing negative views of the death penalty and said that her religious beliefs taught her that the death penalty was wrong.

We have identified a number of factors that may be relevant in determining whether purposeful racial discrimination has been proved.[9] The appellant has not shown us any factors to consider other than the races of the struck venire members. The appellant's observation that these five venire members were qualified to be jurors is irrelevant for the purpose of proving racial discrimination. We do not believe that the trial judge's decision on these five venire members was clearly erroneous.

A sixth venire member, Johnson, gave questionnaire answers similar to the answers of white venire members whom the State did not strike. Johnson rated his support for the death penalty as 5 out of 10 on the juror questionnaire. The State explained that it struck all panelists who gave an answer of less than 6, except for two white venire members, Jones and Riley, who answered 5. The State's race-neutral reason for differentiating among the three was that Jones and Riley seemed particularly offended by the murder of children under the age of six. In such a situation, we may look at how the State conducted its *voir dire* examination of the relevant panelists to see if the prosecution's stated reasons reflect the actual *voir dire* questioning.[10]

The State asked each of these three how he felt about the murder of a child under the age of six relative to the other types of capital murders. Johnson stated that on a 1 to 10 scale, he was a 5 in terms of general support for the death penalty, and that he would "still sit in the middle" on the particular matter of "a child killer." In contrast, Jones, who had listed himself as "a 5 or a 6"

---

[9] *See, e.g., Watkins*, 245 S.W.3d at 448-49; *Keeton v. State*, 749 S.W.2d 861, 868 (Tex. Cr. App. 1998).

[10] *Reed v. Quarterman*, 555 F.3d 364, 376 (5th Cir. 2009).

on the death penalty, declared that murdering a child was the worst type of capital murder: "I would probably have a bias around 9 or so, because I just couldn't believe it." Riley also ranked murder of a child under the age of six as the worst of the capital offenses. He went so far as to declare that he would consider the murder of a child to be worse than if he himself were murdered, because he "would be in a better position than a child" to defend himself. After examining the record, we cannot find that the trial judge's ruling on this challenge was clearly erroneous.

The seventh venire member was Greenhauf,[11] an American with dual Brazilian citizenship who was born to American missionaries in Brazil and described himself as white on the juror questionnaire. In two points of error, the appellant complains about the strike itself, and that "the trial court erred in denying appellant a hearing on his '*Batson*' challenge."

The appellant says that there was not a *Batson* hearing regarding the Greenhauf strike. But during the hearing for all of the appellant's *Batson* complaints, the appellant argued that Greenhauf was struck for racial reasons. The appellant explained that Greenhauf was "a Latino" who had spent "half his life" in Brazil. When the prosecutor pointed out that Greenhauf was "a white male," the trial court responded, "Well, I think that's sufficient," and did not require the State to present a race-neutral reason for the strike.

"[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."[12] In this case, even if the trial court did not explain it in such terms, the appellant did not make a prima

---

[11] The name is also spelled "Greenhaw" at different points in the record.

[12] *Johnson v. California*, 545 U.S. 162, 170 (2005).

facie case of racial discrimination and therefore the hearing did not proceed to the second and third steps.[13]

Later in the hearing, and unprompted by the trial court, the State gave its reasons for striking Greenhauf.[14] Once the State offers a race-neutral explanation for a challenged strike, whether the appellant made a prima facie showing of racial discrimination becomes moot, and a reviewing court should look at the State's reasons.[15] Here, the State claimed that Greenhauf "thinks spending a lifetime in prison is equivalent to the death penalty" and was "very comfortable with giving life just as much as death, if not more." The appellant offers us no reason to believe that the State's reasons were mere pretexts. We overrule points of error one through eight.

## II. Challenges for Cause

After five weeks of examining venire members, the trial court qualified 47 from whom to select a jury. The appellant used his 15 peremptory strikes and was granted another two by the

---

[13] *See Soria v. Johnson*, 207 F.3d 232, 237 (5th Cir. 2000) (where defendant objected to strikes on *Batson* grounds, but the trial court refused to force the prosecution to give race-neutral reason for strikes, trial court's decision "should be treated as a finding that [the defendant] failed to make a prima facie case of discrimination under *Batson*"); *see also Wamget v. State*, 67 S.W.3d 851, 858-59 (Tex. Cr. App. 2001) (holding that establishing the venire member's race, understood as ancestral line and ethnicity, is a burden of the party alleging purposeful discrimination, and that "the party alleging discrimination based on nationality or ethnicity under *Batson* will not adequately establish the venireperson's ethnicity and cognizable racial group by showing only the country of their birth, and such party will likewise fail to meet its burden of persuasion of race discrimination by showing that the peremptory strike was based only on the country of the venireperson's birth.").

[14] The appellant's brief incorrectly says, "No reasons were presented as to why the State struck Mr. Greenhauf."

[15] *Hernandez v. New York*, 500 U.S. 352, 359 (1991).

court. In eighteen points of error, he now argues that each of the venire members he struck, as well as one juror who sat on the case, should have been excused for cause.[16]

## A. Standard of Review

A venire member may be challenged for cause for having a bias for or against the defendant, or against the law.[17] The trial court should grant a challenge for cause if these biases would be so strong as to substantially impair the panelist's ability to carry out his oath and follow the court's legal instructions.[18] The proponent of a strike does not meet his burden "until he has shown that the venireman understood the requirement of the law and could not overcome his prejudice well enough to follow it."[19]

When reviewing the grant or denial of a challenge for cause, we examine the record of the *voir dire* to determine if there is sufficient evidence to support the trial court's ruling.[20] Because the trial court is present to observe the venire member's tone and demeanor, we give great deference to decisions made regarding venire members whose answers are vacillating, unclear, or contradictory.[21]

---

[16] Of the 47 qualified venire members, the appellant objected to 37, including, among others, every juror who was empaneled, the alternate juror, and three venire members who were peremptorily struck by the prosecution and whose strikes the appellant now complains about under *Batson*.

[17] TEX. CODE CRIM PROC. art 35.16. *See Sadler v. State*, 977 S.W.2d 140, 142 (Tex. Cr. App. 1998) (interpreting "bias against the law" to mean "refusal to consider or apply the relevant law").

[18] *Threadgill v. State*, 146 S.W.3d 654, 667 (Tex. Cr. App. 2004).

[19] *Feldman v. State*, 71 S.W.3d 738, 747 (Tex. Cr. App. 2002).

[20] *Id*., at 744.

[21] *Id*.

To show harm for the erroneous denial of a challenge for cause, the appellant must show that the trial court's failure to strike a challengeable juror forced him to use a statutorily-allotted peremptory strike on the challengeable juror, and thus the appellant was unable to strike another objectionable juror who then sat on the jury.[22] Because the trial court in this case granted the appellant two peremptory strikes in addition to his statutory allotment of 15, the appellant must show that the trial court improperly denied three challenges for cause for panelists that the appellant subsequently struck or tried to strike.[23]

## B. Specific Challenges

### 1. "Mitigation Impaired"

For most of the 18 challenged venire members, the appellant raises multiple issues. Before addressing the appellant's complaints about specific venire members, we will first address an issue that the appellant raises regarding nine of the venire members we discuss below, namely that they were "mitigation impaired."[24] What the appellant seems to mean with this phrase is that the venire members would be biased against the mitigation special issue.[25] One venire member, Farmer, referred to mitigating circumstances as "excuses." Another, Early, could not think of circumstances that would sufficiently mitigate against a death sentence for someone convicted of capital murder. Seven other "mitigation impaired" venire members – Wharton, Mitchell, Smith, Park, McLean, Genender, and Kilgore – said that they did not believe that particular factors

---

[22] *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Cr. App. 2007).

[23] *Id*.

[24] Both the appellant and the State use this phrase as a term of art.

[25] *See* TEX. CODE CRIM. PROC. art. 37.071(e)(1).

mentioned by the appellant, such as childhood poverty or war trauma, could ever sufficiently mitigate against a death sentence for someone convicted of capital murder.

Each of these nine said that they could listen to the mitigating evidence and answer the special issues in accord with the law and the facts. There is no requirement that venire members be able to think of sufficiently mitigating circumstances on their own, or that they find any particular circumstance to be sufficiently mitigating.[26] We do not find the appellant's allegation of "mitigation impairment" for any of these nine venire members to be evidence of a bias against the law.

## 2. Farmer

In his ninth point of error, the appellant argues that venire member Farmer was "mitigation impaired," was biased against non-citizens, and had a job interview the day after *voir dire*. The appellant presents no argument or authority for why the job interview would make Farmer challengeable for cause, so we will not address that issue.[27]

On his juror questionnaire, Farmer stated that non-citizen participants in criminal trials – defendants, victims, and witnesses – should be deported. When questioned, he stated his belief that non-citizens were "a huge strain on our economy." However, he also stated that he would give the same credibility to non-citizen witnesses as he gave citizen witnesses. The appellant has failed to show that Farmer was impermissibly biased. We overrule point of error nine.

---

[26] *See, e.g., Threadgill v.* State, 146 S.W.3d 654, 668 (Tex. Cr. App. 2004); *Standefer v. State*, 59 S.W.3d 177, 181 (Tex. Cr. App. 2001) (also noting, "whether a juror considers a particular type of evidence to be mitigating is not a proper area of inquiry"); *see also Raby v. State*, 970 S.W.2d 1, 3 (Tex. Cr. App. 1998).

[27] *See* TEX. R. APP. P. 38.1(i).

### 3. Winn

In his tenth point of error, the appellant argues that venire member Winn was biased against the defendant. Specifically, he points to two exchanges between Winn and defense counsel during *voir dire*.

[COUNSEL]: So in a situation such as [when a child was murdered] … you think you could not be fair in that kind of situation?
[WINN]: It would be pretty tough.
[COUNSEL]: Okay. And there is a difference between being pretty tough–
[WINN]: Uh-huh.
[COUNSEL]: [S]ome people will cross their arms and say … I don't care what's going to be brought to me, if this is the situation that occurred, I am going to vote for the death penalty every time. Do you think you might fall under that category?
[WINN]: Pretty much. If I heard he killed his child, I would–and I am not too crazy about him killing his wife either.[28]

In a later exchange, Winn said that her views on the death penalty were at least in part influenced by her cousin, a prison guard. "I don't believe in [convicted capital murderers] sitting in jail either and having another shot at my cousin." Her cousin had been "beat up a time or two," and Winn "guess[ed] that's part of the job." Defense counsel then asked Winn, "If you were me," would Winn want herself on the jury.

[WINN]: I think you'd love to have me on your jury 'cause I'd try to be fair, but–
[COUNSEL]: Okay. But do you–you do agree with me that–that–
[WINN]: I do come in with some bias.
[COUNSEL]: And that bias is toward the State.
[WINN]: I would say so.

A review of the entirety of Winn's *voir dire* shows that she gave contradictory answers regarding her ability to set aside her prejudices and follow the law. She repeatedly stated that she

---

[28] Winn originally believed that she had been summoned for a case she had heard about in which a man was charged with killing his wife and child.

would listen to the evidence regardless of her predisposition. When she was asked about certain mitigating factors, she did not reject them out of hand but instead said that she would "have to hear more facts." She regarded her prejudices as not strong enough to prevent her from being a fair judge of the facts.

> [WINN]: You know, you have prejudices against–you know–you hear something and you go, oh, that's the worst thing in the world right there, and I just hate that–
> [COUNSEL]: Absolutely–
> [WINN]: –you know, I hate that and I can't tolerate that, and, … I think we all start off with those things. We come with our built-in ranges … of tolerance, you know, and–but then there are the facts, so you have to hear the facts.

The appellant has not shown that Winn could not overcome her bias well enough to follow the law.[29] The trial court heard Winn's conflicting statements regarding her biases and observed her demeanor, and we cannot conclude that the trial court abused its discretion in denying the appellant's challenge. We overrule point of error ten.

### 4. Early

In his eleventh point of error, the appellant argues that venire member Early would automatically vote to assess the death penalty, could not consider the full range of punishment for the lesser-included offense of murder,[30] was "mitigation impaired," and was biased against the defendant because of a prior personal experience involving domestic violence. The argument that Early was impermissibly biased because of her prior experience with domestic violence was not presented to the trial court; therefore we will not address it.[31]

---

[29] *See Feldman*, 71 S.W.3d at 747.

[30] The lesser-included offense was not submitted to the jury.

[31] *See* TEX. R. APP. P. 33.1(a)(1).

In response to a question of whether she would have an open mind during sentencing or whether her mind would be made up after the guilt phase, Early responded:

> Well, I–I am assuming that it's made up. I mean, just flat-out he did it, he's guilty, he did it just because he felt like it. Yeah, my mind's made up. … [H]e doesn't deserve to live. But … it's kind of confusing without knowing exactly what happened, but it would be kind of hard for me to say, you know, okay, no, now I don't think he deserves to die because of the evidence that was presented to me. But if it was–so kind of like just what is presented to me to make up my mind.

Later, under questioning from the court, Early stated that she would answer the special issues based upon the evidence presented to her. These responses thus vacillated between being certain in the outcome and being open to future evidence.

Early also gave contradictory statements as to whether she could consider the full range of punishment for an individual convicted of non-capital murder. Under questioning by the State, Early said that she could consider probation for a murder; under questioning from the appellant, she said that she "would have to say no to probation"; under questioning from the court, she said that she could consider probation.

We begin by saying that we will defer to the trial court's reconciliation of these contradictory statements. We add that, even if Early's statements amounted to a ground of challenge for cause, the failure to excuse her would be harmless error because the ground went to her ability to follow the laws on punishment for the lesser-included offense of murder, and the jury's decision to convict for capital murder gave it no occasion to consider punishment for that lesser-included offense.[32] We overrule point of error eleven.

---

[32] *See King v. State*, 953 S.W.2d 266, 268 (Tex. Cr. App. 1997) (citing precedents).

### 5. Wharton

In his twelfth point of error, the appellant argues that venire member Wharton was "mitigation impaired," could not consider the full range of punishment for the lesser-included offense of murder, would not give credibility to the testimony of psychologists and psychiatrists, and "could not follow the law on intoxication." However, the appellant cites only to portions of the record supporting his argument that Wharton was "mitigation impaired" and provides us with no arguments for his other objections to Wharton. These arguments are insufficiently briefed and we will not address them.[33] We overrule point of error twelve.

### 6. Mitchell

In his thirteenth point of error, the appellant argues that venire member Mitchell would automatically vote to assess the death penalty, was "mitigation impaired," and could not consider the full range of punishment for the lesser-included offense of murder.

As evidence that Mitchell was "an automatic death penalty individual," the appellant quotes two portions of the record. In one, the State asked Mitchell what sort of cases he thought "deserved" the death penalty:

> Well, multiple murders. Just what–what the judge read earlier, multiple murders, murders while in the commission of other crime, grizzly [*sic*] murders. If I was writing the law myself and had the power to do that, I'll guarantee you there would be more to it than there is, but–but the law says grizzly–grizzly murders, multiple murders, murder in commission of other crimes, and so forth and so on.

The State then asked Mitchell how he would change the law if he were "governor for a day." Mitchell did not offer specifics, but said that he thought "there are a lot of people that are

---

[33] *See* TEX. R. APP. P. 38.1(i).

sitting in life terms and long terms that should have been taken out because they're not adding anything to society."

Mitchell's statements do not show that he was so biased against the current law as to be challengeable for cause. Mitchell told defense counsel, "I don't think the death penalty ought to be automatic in any case." He said that he would answer the special issues based on the facts and the law. The trial court was within its discretion not to dismiss Mitchell for being "an automatic death penalty individual."

The appellant's complaint that Mitchell could not consider probation for someone convicted of the lesser-included offense of murder is not supported by the record. Defense counsel explicitly asked Mitchell if he could consider probation on a murder case, and Mitchell responded, "Yes, depending on circumstances–evidence." The appellant does not cite to any place in the record where Mitchell contradicts this statement. We overrule point of error thirteen.

## 7. Smith

In his fourteenth point of error, the appellant argues that venire member Smith would automatically vote to assess the death penalty, was "mitigation impaired," would ignore the trial court's instructions, and would not give credibility to psychologists and psychiatrists.

The appellant cites several statements Smith made regarding her personal opinion on the death penalty, asserting that these show she was "an automatic death penalty juror." However, Smith repeatedly said that she would answer the special issues based on the law and the facts. When the State summarized Smith's view by saying, "You're not going to run right out there and give [the death penalty] to everybody just because you showed up in a murder trial; is that fair to

say?", she agreed: "That's fair." The trial court was within its discretion to deny the challenge based on Smith being "an automatic death penalty juror."

The appellant does not provide argument and record citations for his remaining objections; therefore we will not address them.[34] We overrule point of error fourteen.

### 8. Park

In his sixteenth point of error, the appellant argues that venire member Park was "mitigation impaired," would automatically vote to assess the death penalty, and could not follow the law regarding burdens of proof during the punishment phase. The appellant provides us neither a citation to the record nor argument to support his objection that Park could not follow the law regarding burdens of proof; therefore we will not address this issue.[35]

Under questioning from the State, Park said that those who murder children will always be a continuing threat to society:

> There's no value for human life in that person, so their inclination to try to do that again, their threshold, I think, has been reduced so much that … they could be a threat to my children. They could be a threat to me. They could be a threat to anyone … because there is this narcissistic lack of values.

Park also said that he could not think of an instance where murdering a child would not be a capital offense, and that after convicting a defendant of the capital murder of a child under six years old, he would be predisposed to answer yes on the future-dangerousness special issue.

However, when the State offered a hypothetical of a defendant, convicted of murdering a child, who suffered a stroke and became physically incapacitated after the offense, Park agreed

---

[34] *See* TEX. R. APP. P. 38.1(i).

[35] *See id.*

that there may be "one-in-a-million" circumstances where child murderers were not continuing threats. He said that he "wouldn't be making a snap decision," would give the defendant "the benefit of the doubt," and consistently said that he would try to overcome whatever personal biases he had. There is sufficient evidence to support the trial court's denial of the appellant's challenge. We overrule point of error sixteen.

### 9. Bolanos

In his seventeenth point of error, the appellant argues that venire member Bolanos could not speak English well enough to be a juror, indicated that he would not be fair, and did not want to be a juror.

From the record it is clear that Bolanos regarded being a juror in a capital case as a weighty matter, and stated that he would rather not be on a capital jury. However, he repeatedly stated that he would sit on the jury and follow the instructions if that was his civic duty. The appellant does not explain why these sentiments made Bolanos challengeable for cause.

While the record shows that English was Bolanos's second language, there is no support in the record for the appellant's assertion that Bolanos could not speak English well enough to sit as a juror. The record contains 53 pages of *voir dire* questions and answers between Bolanos and the parties, all conducted in English.

The appellant seems to assert that a misunderstanding between defense counsel and Bolanos regarding the nature of the special issues shows that Bolanos's English was insufficient to allow him to be a qualified juror. However, this portion of the *voir dire* was contentious and Bolanos was being uncooperative because he believed that defense counsel was "trying to make [him] say" things he did not believe. Among other signs of conflict between Bolanos and defense

counsel, the trial court instructed defense counsel "not to throw the exhibits," and "not to pound the exhibits." The trial court heard the *voir dire* and saw Bolanos's demeanor in the court room, and we will defer to its determination of whether Bolanos's English was sufficient.

Bolanos also said that in a case involving the capital murder of a child, "I don't feel that I would be qualified to be fair in that case, because I will be overwhelmingly … in favor of [the] death penalty." However, after the State explained the law to him, Bolanos repeatedly said that he could follow the law and answer the special issues based on the facts of the case. Defense counsel repeatedly asked Bolanos whether he would automatically assess the death penalty, and Bolanos maintained that he would follow the law and not prejudge the special issues. There is sufficient evidence to support the trial court's denial of the appellant's challenge. We overrule point of error seventeen.

### 10. LaGrassa

In his eighteenth point of error, the appellant argues that venire member LaGrassa would automatically vote to assess the death penalty and would give police officers more credibility than other witnesses.

The appellant points us to two exchanges to demonstrate LaGrassa's biases:

[COUNSEL]: Under that situation where you've knowingly and intentionally found an individual guilty of having killed two or more people–or two people. Okay. Wasn't self-defense, wasn't defense of other, the person intended to do it, meant to do it, right? Wasn't insane. In that situation your answer to Special Issue Number 1 would always be yes.
[LAGRASSA]: Yes.

Shortly thereafter, defense counsel posed the same hypothetical but added that the jury had determined the offender posed a future danger.

[COUNSEL]: So in that situation your answer to Special Issue Number 2 would always be no, there would not be any mitigating circumstances, is that correct?
[LAGRASSA]: That's correct.

Elsewhere in his *voir dire*, however, LaGrassa gave conflicting answers. The first time defense counsel posed a hypothetical regarding the mitigation special issue, LaGrassa said that he would assess the death penalty only "[i]f there was no further evidence or no mitigating circumstances." When the prosecutor described the special issues and told LaGrassa of the need to wait until hearing evidence during the punishment phase before deciding the special issues, he asked LaGrassa, "Could you, sir, keep an open mind and wait till you hear all the evidence and then apply the law after you have done so?" LaGrassa responded, "Yes." Under questioning from the court, LaGrassa said that he could keep an open mind and answer the special issues in accord with the law and the facts. We will defer to the trial court's reconciliation of these contradictory statements.

For his argument that LaGrassa was impermissibly biased in favor of police, the appellant refers us to LaGrassa's juror questionnaire, in which he said that prosecutors were "good guys," there needed to be more police officers, and defense attorneys were "bad guys." Elsewhere in the record, LaGrassa provides vacillating statements on the issue of police credibility, finally concluding that he would "probably [start a police witness] a little bit higher." A venire member is not challengeable for cause because he is more or less skeptical of certain categories of witnesses, so long as he does not hold extreme or absolute positions regarding credibility.[36] We overrule point of error eighteen.

---

[36] *Feldman*, 71 S.W.3d at 747.

## 11. McLean

In his nineteenth point of error, the appellant argues that venire member McLean would give too much credibility to the testimony of police officers, was "mitigation impaired," would automatically vote to assess the death penalty, and was biased against non-citizens.

McLean stated that he would give police officers more credibility than other witnesses, but also said that he would not automatically believe a police officer. A venire member is not challengeable for cause because he is more or less skeptical of certain categories of witnesses, so long as he does not hold extreme or absolute positions regarding credibility.[37]

The appellant's argument that McLean would automatically vote to assess the death penalty is based on two statements. First, McLean said that sentencing capital murderers to life in prison without the possibility of parole is a waste of money. However, McLean repeatedly stated that he would follow the law, answer the special issues based on the facts, and not automatically assess the death penalty. The trial court was within its discretion to believe that McLean could follow the law despite the "waste of money" comment.

Second, McLean stated that some crimes call for the death penalty regardless of whether the offender has a history of violent conduct. This is not evidence of bias against the law; prior violent behavior is not a requirement for a death sentence.[38]

Regarding non-citizens, where the juror questionnaire asked how non-citizens should be treated in the legal system, McLean wrote "Tried, guilt determination, and deportation." The appellant claims this shows that McLean will always find non-citizens guilty. McLean denied this

---

[37] *Id.*

[38] *See* TEX. PEN. CODE § 19.03.

interpretation during *voir dire*, and the trial court was within its discretion to believe McLean. We overrule point of error nineteen.

### 12. Kilgore

In his twentieth point of error, the appellant argues that venire member Kilgore would automatically vote to assess the death penalty and was "mitigation impaired."

To show Kilgore's bias in favor of the death penalty, the appellant cites an example of Kilgore stating her "belief" that capital murderers "should" get the death penalty, and refers us to this exchange:

> [COUNSEL]: Well explain to me what you mean when you say that you're probably going to answer that Special Issue Number 1 yes.
> [KILGORE]: Okay, if–I agree if he–if it's being where I feel that it needs to be a choice of life or death, then, yes, I would say yes–
> [COUNSEL]: Yes, you will–
> [KILGORE]: –to Special Issue 1.
> [COUNSEL]: Yes, you will always answer Special Issue Number 1 yes, is that correct?
> [KILGORE]: Yes.

Immediately before this exchange, Kilgore had repeatedly insisted that she "wouldn't necessarily" answer yes on the first special issue, that she had "a right to change her mind" based on the facts of the case, and was "not necessarily … just automatically saying they deserve the death penalty." The trial court was within its discretion to believe her repeated pledges to answer the special issues in accord with the law and facts. We overrule point of error twenty.

### 13. Roberts

In his twenty-first point of error, the appellant argues that venire member Roberts would automatically vote to assess the death penalty and would "shift the burden over to the Defense."

To support his assertion that Roberts would automatically vote to assess the death penalty in all situations, the appellant quotes an exchange in which Roberts expresses support for the death penalty only in certain situations:

> [PROSECUTOR]: And in talking to you about the death penalty and whether you are in favor of the death penalty, you put that you were in favor of the death penalty, and you said, "If during the course of hearing the case I find that it's been proven that the defendant is guilty and the crime justifies the individual being put to death, I have no issues with deciding that the individual be put to death." Is that still how you feel here today?
> [ROBERTS]: Yes.
> [PROSECUTOR]: Can you tell us a little bit why you feel that way?
> [ROBERTS]: Well, I've always felt that true justice is an eye-for-an-eye, and unless you can give me a reason not to be basically eye-for-an-eye, then the person deserves to die if they kill somebody.

The appellant also suggests that this excerpt shows that Roberts would shift the burden to the defense to prove that the defendant should not be executed. However, this was a statement of Roberts's personal beliefs. Throughout his *voir dire*, Roberts stressed that regardless of his personal beliefs he would answer the special issues in accord with the law and the facts. The trial judge was within his discretion not to dismiss Roberts on for this reason. We overrule point of error twenty-one.

## 14. Genender

In his twenty-second point of error, the appellant argues that venire member Genender would automatically vote to assess the death penalty and was mitigation impaired. The appellant cites Genender's opinion regarding future dangerousness: "I don't see how … you can convict someone of capital murder at the guilt phase and not immediately have some feelings about, oh, this person might be … a danger to society."

Immediately following that statement, though, Genender explained that whatever presumption he would have after the end of the guilt phase would not, by itself, be sufficient to answer yes on the first special issue. He insisted that the State would still have the burden of proof, and that he would follow the law and answer the special issues according to the facts.

The appellant also directs us to another lengthy exchange in which Genender says that "to the extent [his] passions would be inflamed about a capital crime," it would be one that involved children. "[W]ould I be the best juror for that case? No, I don't think I would be. … I would hear that evidence and it would make me angry at a gut level beyond rational thought." Genender said that his emotions might be so inflamed that he "possibly" might automatically vote for the death penalty in a child murder case.

Genender said repeatedly, however, that he would try to follow the law and set aside his emotions, and (as we have said above) that he would follow the law and base his verdict on the facts. The trial court was present to observe his demeanor and listen to the tone of his answers, and its determination that Genender was not impermissibly biased is entitled to great deference. We overrule point of error twenty-two.

### 15. Fletcher

In his twenty-third point of error, the appellant argues that venire member Fletcher would automatically vote to assess the death penalty. Additionally, the appellant argues that "[d]ue to a fire alarm going off at the court house, Defense Counsel was unable to continue questioning" Fletcher, thus denying the appellant due process.

Fletcher said she "believes" that if two children are murdered, the offender should "definitely" be executed. However, immediately after that statement, Fletcher insisted that she

would answer the special issues in accord with the law and the facts, and that she would not automatically vote for the death penalty: "But if the evidence doesn't prove that he should die, he shouldn't." The trial court was within its discretion not to dismiss Fletcher on this ground.

The record does not support the appellant's assertion that a fire alarm stopped Fletcher's *voir dire*. Rather, the trial court cut off defense counsel for badgering the witness. The only mention of a fire alarm in the record occurred only after Fletcher answered what the trial court had announced was the appellant's last question. The appellant provides us with no argument for why this violated due process. We overrule point of error twenty-three.

### 16. Chavoya

In his twenty-fourth point of error, the appellant argues that venire member Chavoya would automatically assess the death penalty for an offender convicted of the capital murder of a child.

The appellant cites statements from Chavoya that imply an inability to follow the law. Chavoya responded affirmatively when asked whether an offender convicted of the capital murder of two people would always be a future danger. A short time later, Chavoya also said that if the capital murder is "always proven without a doubt," he would answer yes on the future dangerousness special issue "every time in that situation." However, Chavoya hedged both of these statements, immediately following up his categorical declarations with caveats that "every situation is different," stating that he would need to "hear all the evidence," and that his answer might be different if there were "variances" in the situation.

Similarly, Chavoya said that in the cases of the capital murder of a child or of two or more people, he would not consider mitigating circumstances. Yet, when defense counsel gave him a

hypothetical where he was on a jury that had convicted an offender of the capital murder of two people, Chavoya listed several mitigating factors he would look for and said that mitigation "would be important to me."

Under questioning from the court, Chavoya said that he would answer the special issues in accord with the law and the facts. In light of the contradictory answers Chavoya gave, the trial court did not abuse its discretion in denying the appellant's challenge for cause. We overrule point of error twenty-four.

### 17. Fitzgerald

In his twenty-sixth point of error, the appellant argues that juror Fitzgerald would not consider the full range of punishment for the lesser-included offense of murder. The appellant cites the following exchange:

> [COUNSEL]:  And the range of punishment is anywhere from five years to 99 years or life, and in this case, the possibility of community service or probation could be assessed if–whatever the jury felt. Is your mind open to the full range of punishment is that the situation?
> [FITZGERALD]: Is my mind open? My mind would probably–yes, my mind would be open to a lot of things, but the fact that you included community service and–and–you specifically said a murder, I don't think so.
> [COUNSEL]: Okay.
> [FITZGERALD]: My mind would not be open to that.

A venire member who cannot consider the full range of punishment for any offense of which the accused might be found guilty is challengeable for cause. [39] However, community service is not a possible punishment for murder. Community service is available only in a case in

---

[39] *Ladd v. State*, 3 S.W.3d 547, 559 (Tex. Cr. App. 1999).

which the punishment is confinement in a county jail,[40] which is not a possible punishment for murder. Thus Fitzgerald's refusal to consider it is not evidence of bias against the law applicable to this case, in which the possible punishments were only death or confinement in prison. During an earlier discussion with the State, Fitzgerald had said that she was open to the full range of punishment for murder, including probation (which was the former statutory term, and which is still informally used, for what statutes now call "community supervision.")[41]

Later, the appellant asked Fitzgerald, based on the indictment for this case but presuming the jury convicted of murder instead of capital murder, whether she could consider the full range of punishment. Having seen the indictment, which specified that two people had been killed, Fitzgerald said she could not. A venire member is not challengeable for refusing to consider the full range of punishment after being presented with specific facts of a case.[42] We overrule point of error twenty-six.

### 18. Venire Members Pierot and Mathew

Because the appellant must show that the trial court erroneously denied at least three challenges for cause in order to be entitled to relief,[43] we need not address the appellant's remaining two points of error regarding venire members Pierot and Mathew. We overrule points of error fifteen and twenty-five.

---

[40] See TEX. CODE CRIM. PROC. art. 42.036(a).

[41] See *id.*, art. 42.12.

[42] *Sadler v. State*, 977 S.W.2d 140, 143 (Tex. Cr. App. 1998).

[43] *See Saldano*, 232 S.W.3d at 99.

## C. Constitutional Challenges to the Jury

In his twenty-seventh and twenty-eighth points of error, the appellant asserts that "the jury as constituted was biased or prejudiced which deprived appellant of a fair trial" in violation of "the United States Constitution" and Article I, Section 10 of the Texas Constitution. He asserts that the statutory *voir dire* errors he complained of are also constitutional errors. The appellant provides us with no authority for these propositions. Having found no error in *voir dire*, we overrule these points of error.

## D. The State's Challenges for Cause

In his twenty-ninth point of error, the appellant asserts that the trial court erred in dismissing three venire members that the State challenged for cause. However, the erroneous granting of a challenge for cause will result in a reversal only if the record shows that the error deprived the defendant of a lawfully constituted jury.[44] The record does not show this. We overrule point of error twenty-nine.

## III. Ineffective Assistance

In points of error thirty and thirty-one, the appellant complains that he was denied effective assistance of counsel in violation of the Sixth Amendment.[45] He contends that his counsel was ineffective "since no mitigation evidence was presented to the jury."

---

[44] *Jones v. State*, 982 S.W.2d 386, 394 (Tex. Cr. App. 1998).

[45] The appellant's appellate counsel was also a member of his trial team; additionally, his lead counsel at trial presented oral argument to this Court.

### A. Standard of Review

The normal test for ineffective-assistance claims is that established in the *Strickland* case, which requires the appellant to show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) but for counsel's unreasonable actions or inactions, there is a reasonable probability that the result of the proceeding would have been different.[46]

Instead of using this standard *Strickland* analysis, the appellant argues that this case should be judged under the standard announced in *United States v. Cronic*.[47] Handed down by the Supreme Court the same day as *Strickland*, *Cronic* dealt with a case where the defense counsel did not participate in any part of the trial. In such a situation, where counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing," courts should presume prejudice rather than going through the second part of the *Strickland* analysis.[48] However, because the only portions of the appellant's trial that defense counsel did not participate in were presenting punishment evidence and presenting a jury argument during the punishment phase[49] we believe that counsel's failure, if any, was not "entire," and thus *Strickland*, not *Cronic*, controls our analysis.[50]

---

[46] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[47] 466 U.S. 648 (1984).

[48] *Id.*, at 658-59; *Cannon v. State*, 252 S.W.3d 342, 348-49 (Tex. Cr. App. 2008).

[49] Defense counsel presented an opening statement and a jury argument during the guilt phase, reviewed the jury charge during the guilt phase, and cross examined all of the State's witnesses during the guilt phase and during the punishment phase.

[50] *See Bell v. Cone*, 535 U.S. 685, 696-97 (2002) (where the only portions of a trial in which defense counsel did not participate were presenting punishment evidence and a jury argument during the punishment phase, *Strickland*, not *Cronic*, applied).

## B. Background

Trial began on Monday, September 8, 2008. The State presented evidence of guilt for three days, and then on Wednesday, September 10, the jury was sent home until the following Monday in order to accommodate a juror's previously-planned fishing trip. When trial resumed on Monday, September 15, the State finished presenting its guilt evidence, and the defense rested without presenting any guilt evidence. After a short deliberation, the jury returned a guilty verdict. That same day, the State presented two witnesses for punishment evidence and rested on the issue of punishment.

After court recessed for the day, a juror fell down some steps at the courthouse and severely injured her arm. Further complicating the trial at this point, the trial court, unbeknownst to the parties, had told another juror that there would be no trial on Wednesday, September 17, or Thursday, September 18, in order to allow that juror to travel to Lubbock and attend the induced birth of his grandchild. In light of these events, on Tuesday, September 16, the trial court recessed for one week to allow the injured juror to recover and the Lubbock-bound juror to complete his trip.

When the trial court announced this decision, defense counsel objected. The defense had planned to present eleven witnesses over three days, with several witnesses flying in from out of state and the appellant's mother, brother, and grade-school teacher flying in from El Salvador. Defense counsel insisted that they were prepared to begin their case that morning, and that it would be difficult to arrange to have all of the defense witnesses back in Dallas the next week. The appellant asked the trial court to replace the injured juror with the alternate, restrain the

Lubbock-bound juror from leaving town, and to proceed with the trial that day. The trial court denied this request.

In the following weeks, the trial court would attempt to reschedule the trial no less than three times. Finally, the court established Monday, October 27 as the date for trial to resume, despite the appellant's insistence that his main witness, Dr. Ricardo Weinstein, could not be present that week. The appellant insisted that Dr. Weinstein had a prior commitment assisting the defense in a death-penalty case in North Carolina and would not be available until late January, 2009.

When trial resumed on October 27, Dr. Weinstein was not present,[51] and the lead defense counsel, Donna Winfield, advised the court that she would not call any witnesses without Dr. Weinstein's testimony being first. Winfield also refused to rest her case, attempting to get the trial court to reconsider a motion for continuance she had made the prior week. Even after the trial court had her arrested for contempt, Winfield refused to participate in the proceedings. After releasing Winfield from custody and confirming that she would not call any witnesses, the trial court recalled the jury and advised them that "you have heard all the evidence that you're going to hear . . . in this matter."

The next morning, October 28, Winfield refused to respond when asked whether the appellant had any objections to the jury charge. After the court read the charge to the jury, the court asked whether the appellant wanted to present an argument.

---

[51] Dr. Weinstein had been sworn in as a witness for a *voir dire* hearing on September 15. At several on-the-record hearings during the six-week recess, the trial court asked the appellant whether he wanted to attach Dr. Weinstein. Not until trial resumed on October 27 did the appellant request an attachment. The trial court denied the request when it decided to close the punishment evidence.

> MS. WINFIELD: Your Honor, based on the rulings of the Court, my client–
> THE COURT: Stop. It's just a yes or no. You've got a right to make an argument
> or not make an arguments [*sic*]. Not give a speech to me. Either–you have a right
> the [*sic*] make an argument or not make an argument.
> MS. WINFIELD: My client has been deprived of effective assistance of counsel
> and–
> THE COURT: Alright [*sic*]. Stop. Stop.
> MS. WINFIELD: I cannot do that.
> THE COURT: All right. State?

The State then presented its jury argument, and the jury was sent to deliberate. The jury soon

returned, answering yes to the future-dangerousness special issue, and no to the mitigation special

issue. The court asked whether there was any legal reason it could not sentence the appellant, to

which Winfield responded, "I can't proceed, Judge." The court then sentenced the appellant to

death.

## C. Analysis

The appellant does not complain about specific actions or inactions of his counsel, but

instead points us to defense counsel's failure to present punishment evidence and asserts that "in

these circumstances, prejudice to the defense is irrefutabl[y] presumed."

The appellant presents us with no argument as to which witnesses his counsel should have

called. It is plain from the record that defense counsel considered Dr. Weinstein to be the crux of

their punishment case. However, the fact that defense counsel did not call Dr. Weinstein to testify

cannot be the basis of an ineffective assistance claim because the appellant has made no showing

that Dr. Weinstein was available to testify.[52] In the hearings leading up to the October 27 trial

date, on October 27 itself, and during the motion for new trial hearing that occurred in December,

---

[52] *See Ex Parte Ramirez*, 280 S.W.3d 848, 853 (Tex. Cr. App. 2007) (For this court to find that counsel was ineffective for not calling a witness, the appellant "must show that [the witness] had been available to testify and that his testimony would have been of some benefit to the defense.").

defense counsel consistently maintained that Dr. Weinstein was not available because he was assisting the defense at the North Carolina trial.

*Strickland* does not require defense counsel to present mitigating evidence in every case.[53] By not specifying what evidence his counsel should have presented, the appellant has failed to present a basis to conclude that defense counsel's decision not to present evidence was unreasonable, or that there is a reasonable probability that the result would have been different. Points of error thirty and thirty-one are overruled.

## IV. Trial Scheduling

In points of error thirty-two through thirty-five, the appellant complains about decisions that the trial court made in setting trial dates.

## A. Motions for Continuance

On October 20, the appellant filed a written, sworn motion for continuance, stating that neither Dr. Weinstein nor Richard McGough–an investigator who helped assemble mitigation evidence but whom the appellant did not intend to call as a witness–was available on October 27. At various hearings over the next week, the appellant repeatedly reurged this motion for continuance, and filed another motion for continuance on October 27. In his thirty-third point of error, the appellant alleges that the trial court erred in denying these motions.

We review a trial court's denial of a mid-trial continuance on an abuse of discretion standard.[54] The October 20 motion for continuance makes no mention, as required by statute, of

---

[53] *Wiggins v. Smith*, 539 U.S. 510, 533 (2003).

[54] *Vasquez v. State*, 67 S.W.3d 229, 240-41 (Tex. Cr. App. 2002)

"[t]he diligence which has been used to procure [the witness's] attendance."[55] Indeed, testimony during the new trial hearing shows that there was no diligence on the part of the appellant to procure Dr. Weinstein's presence at the October 27 trial setting. The appellant refused several offers by the trial court to attach Dr. Weinstein.[56] A trial court does not abuse its discretion when it denies a motion for continuance that does not meet statutory requirements.[57]

The October 27 motion for continuance requested a delay in order to obtain the presence of Dr. Weinstein as well as the appellant's mother and brother. This motion stated that the "[d]efense has taken all necessary steps to procure their appearance by contacting them or a representative, and inform[ing] them of the court date and their need to appear." This conclusory statement is insufficient to meet the statutory requirements for a showing of diligence, thus this motion was facially deficient and the trial court did not abuse its discretion in denying it.[58]

Because there was no error in overruling these motions, there was also no error, as alleged in point of error thirty-four, in denying the appellant's motion for new trial based on the motions for continuance. Points of error thirty-three and thirty-four are overruled.

---

[55] TEX. CODE CRIM. PROC. art. 29.06; *see also Gentry v. State*, 770 S.W.2d 780, 786-87 (Tex. Cr. App. 1988) (applying Article 29.06 requirements to motions for continuance made during the course of trial under Article 29.13).

[56] Winfield testified that she was concerned that if Weinstein were forcibly removed from the North Carolina trial, he would be upset and not make a good witness. "[Expert witnesses'] mind set[s] and their egos have to be assuage[d], and their–I don't want to make it sound as though they're children, but in some respects they [are] . . . [T]o tak[e] a potential expert witness out of a trial that they're immersed in and force them to come back . . . to another trial would have been counter productive to our defense." She was also concerned that removing Dr. Weinstein to Dallas would cause problems for the defense in the North Carolina case. Dr. Weinstein was a consulting expert for the North Carolina defendant, and was a potential rebuttal witness. However, he was not subpoenaed and did not testify during that trial.

[57] *Gentry*, 770 S.W.2d at 786-87.

[58] During the new trial hearing, Winfield stated that she had done nothing whatsoever to procure the presence of the appellant's mother and brother for the October 27 court date.

B. Due Process

In his thirty-second and thirty-fifth points of error, the appellant complains that he was denied due process of law by the scheduling decisions of the trial court. In both points of error, the appellant faults the trial court for stopping the trial on September 15, when his witnesses were present, and for restarting the trial on October 27, when "the defense's family and expert witnesses could not be in attendance."

The trial court stopped the trial on September 15 because there was one juror who was physically incapacitated, and another who had told the judge that he would not be able to focus on the trial unless he was allowed to attend the birth of his grandchild on September 16 in Lubbock. The appellant provides no argument for why this "arbitrary delay" was a violation of due process, rather than being a proper use of the trial court's inherent authority to control the trial.

Even if a denial of a motion for continuance results in a defendant presenting no evidence, this does not necessarily violate due process.[59] There is no mechanical test for determining whether a denial of a continuance violates due process; rather, each case will be considered individually.[60] Here, the appellant made no showing to the trial court that he diligently attempted to secure the presence of his witnesses, and the full record reveals that there was indeed no diligence. The appellant's right to due process was not violated by the trial court's refusal to grant a continuance. Points of error thirty-two and thirty-five are overruled.

---

[59] *Ungar v. Sarafite*, 376 U.S. 575, 589-90 (1964).

[60] *Id*.

## V. Mental State Evidence

During the guilt phase of the trial, the appellant sought to introduce testimony to support a

theory that the appellant lacked the culpable mental state of intent or knowledge. Points of error

thirty-six through thirty-eight complain of how that evidence was treated by the trial court

### A. Background

The appellant's theory came from Dr. Weinstein, who summarized his potential testimony

during a defense proffer:

> [F]eelings and emotions interfere in our every day functioning. … [A]t the time
> that Mr. Medina committed this tragic event, he was not aware of the separation
> between himself and his children because of the way the emotions affect him and
> the circumstances [that] led to those emotions. And in reality he committed suicide
> and because … the children were an extension of himself, that's what led to the
> death of the children. It was a self destruction act that included what he perceived
> as an extension of himself.

The appellant also proffered that he would present lay witness testimony showing that he was

distraught and suicidal in the days leading up to the murders.

During a lengthy discussion with the State and the court, the appellant argued that the

testimony would allow the jury to convict either for the lesser-included offense of murder,[61] or

manslaughter.[62] The court, however, believed that the evidence would go only toward negating the

required mental state for capital murder, thus moving the jury to acquit altogether. The court ruled

that the evidence was admissible, but that it would not entitle the defense to lesser-included

---

[61] *See* TEX. PEN. CODE § 19.02(b)(2) ("A person commits an offense if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.").

[62] *See* TEX PEN. CODE § 19.02(d), reducing murder to a second degree felony if the defendant proves he committed the murder under the immediate influence of sudden passion arising from an adequate cause. While this is still murder, the degree of the offense would be the equivalent of manslaughter, also a second-degree felony, and the appellant referred to the reduced-punishment murder as "manslaughter." The appellant specifically requested that, if this evidence were admitted, the jury be charged with manslaughter as described in Penal Code § 19.04.

offense charges. The defense then chose not to present the evidence but to reserve it for the punishment phase.

## B. Admission of Evidence

In point of error thirty-six, the appellant complains that:

> The trial court erred in holding, as a matter of law, that Texas law does not allow evidence of the defendant's mental impairment in determining whether the State proved the required culpable mental state beyond a reasonable doubt in the guilt/innocence state of the trial.

The record does not show such a ruling by the trial court. Although the trial court originally ruled the evidence inadmissible, later in the hearing the State dropped its objection and the trial court ruled that the testimony was admissible for the purpose of challenging the State's proof regarding the appellant's mental state. The trial court allowed the evidence, and the appellant seeks no additional relief in this point of error. Point of error thirty-six is overruled.

In point of error thirty-seven, the appellant complains that Dr. Weinstein's testimony should have been admitted "on the issue of diminished capacity." Texas law does not recognize diminished capacity as an affirmative defense.[63] This point of error is overruled.

## C. Ineffective Assistance of Counsel

In point of error thirty-eight, the appellant asserts that his counsel was ineffective for failing to call Dr. Weinstein to testify during the guilt phase. After the trial court ruled that Dr. Weinstein could testify, the appellant's counsel quite explicitly made a "declaration of a strategic decision" not to have Dr. Weinstein testify. Defense counsel thought the State "would be able to question Dr. Weinstein in front of the jury regarding potential extraneous offenses against the

---

[63] *See Ruffin v. State*, 270 S.W.3d 586, 591-96 (Tex. Cr. App. 2008); *Jackson v. State*, 160 S.W.3d 568, 573-74 (Tex. Cr. App. 2005).

defendant, which [she] believe[d] would be highly prejudicial." Defense counsel stated that Dr. Weinstein would be best used during the punishment phase.

Trial counsel's decisions regarding trial strategy, even if they fail, do not constitute ineffective assistance of counsel unless they fall below an objective standard of reasonableness.[64] The decision not to call a witness out of fear that extraneous offenses will be introduced during cross-examination is reasonable.[65] Point of error thirty-eight is overruled.

## VI. Autopsy Photographs

In point of error thirty-nine, the appellant complains that the trial court erred by admitting 16 prejudicial photographs of the victims. He contends that the number of photographs was excessive, and the probative value of the photographs was minimal because the medical examiner testified regarding the wounds.

### A. Standard of Review

The admissibility of a photograph is within the sound discretion of the trial judge.[66] Generally, a photograph is admissible if verbal testimony as to matters depicted in the photographs is also admissible.[67] If there are elements of a photograph that are genuinely helpful to the jury in making its decision, the photograph is inadmissible only if the emotional and prejudicial aspects substantially outweigh the helpful aspects.[68]

---

[64] *Strickland*, 466 U.S. at 687-88.

[65] *Ex parte McFarland*, 163 S.W.3d 743, 757-58 (Tex. Cr. App. 2005).

[66] *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Cr. App. 2007).

[67] *Id*.

[68] *Erazo v. State*, 144 S.W.3d 487, 492-93 (Tex. Cr. App. 2004); *see* TEX. R. EVID. 403.

A court may consider many factors in determining whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice. These factors include: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black and white, whether they are close-up, and whether the body depicted is clothed or naked.[69]

## B. Analysis

There are eight photographs of each victim: one showing the victim fully clothed on an autopsy table, one showing the victim nude on the autopsy table, and closeups of each victim's two entrance and two exit wounds. The photographs are not repetitive, and each has a different focus from the others. The photographs are no worse than would be expected in this sort of crime. The only alteration to the bodies is that portions of the victims' hair have been shaved to show the wounds. The photographs are 8.5" x 11" and in color.

The photographs were used during the medical examiner's testimony to help explain the nature of the wounds. We cannot find that the probative value of these photographs was substantially outweighed by their prejudicial effect. Point of error thirty-nine is overruled.

## VII. Motion to Recuse

On the morning of October 27, the appellant filed a motion to recuse the trial judge, the Honorable Andy Chatham, based on Rule of Civil Procedure 18a[70] and Article 30.01 of the Code of Criminal Procedure.[71] The motion purported to show that Judge Chatham was impermissibly

---

[69] *Wyatt v. State*, 23 S.W.3d. 18, ~~20~~ 29 (Tex. Cr. App. 2000).

[70] This rule allows recusal motions based on "any disability of the judge to sit in the case." *See also Arnold v. State*, 853 S.W.2d 543, 544 (Tex. Cr. App. 1993) (Rule of Civil Procedure 18a applies to criminal cases).

[71] "No judge or justice of the peace shall sit in any case where he may be the party injured, or where he has been of counsel for the State or the accused, or where the accused or the party injured may be connected with him by
(continued...)

biased against the defense, and had "acted as an adversary rather than a jurist. . . . Judge Chatham is no longer acting as a disinterested jurist but rather a disrupting and corrupting force." At a hearing before the district's presiding judge, the Honorable John Ovard, Winfield testified regarding Judge Chatham's scheduling decisions and his attempts to contact the appellant's witnesses to determine their availability. In his fortieth point of error, the appellant argues that Judge Ovard erred in overruling the motion to recuse.

Both the motion and Winfield's testimony were based on the appellant's objections to the court dates that Judge Chatham set and his rulings that went against the appellant. During cross-examination, the State asked Winfield what specific extra-judicial bias she could point to. Winfield responded that "[her] motion speaks for itself."

A trial judge must be recused if a reasonable person, knowing all the circumstances involved, would harbor doubts as to the impartiality of the trial judge.[72] We review a denied motion to recuse for abuse of discretion,[73] and we will not reverse the trial judge's decision so long as the ruling was within the zone of reasonable disagreement.[74] The appellant has shown us no evidence of actual bias, and thus has not persuaded us that Judge Ovard abused his discretion. Point of error forty is overruled.

---

[71](...continued)
consanguinity or affinity within the third degree, as determined under Chapter 573, Government Code."

[72] *Kemp v. State*, 846 S.W.2d 289, 305 (Tex. Cr. App. 1992).

[73] TEX. R. CIV. P. 18a(f).

[74] *Kemp*, 846 S.W.2d at 306.

## VIII. Previously Decided Issues

In points of error forty-one through fifty-three, the appellant presents us with 12 issues already decided by this court, and invites us to review our prior stands.

In point of error forty and forty-one, the appellant asks us to review the jury's verdict regarding the mitigation special issue. Because the jury's answer to this question is inherently subjective, we do not review the answer for sufficiency of the evidence.[75]

In point of error forty-five, the appellant argues that article 37.071 of the Code of Criminal Procedure, which establishes Texas's capital-sentencing procedures, violates the Fifth and Fourteenth Amendments to the Federal Constitution, as well as Article I, Sections 13 and 19 of the Texas Constitution. The appellant's federal claim hinges on his interpretation of *Bush v. Gore*,[76] an argument that we have previously rejected.[77] The appellant presents us with no arguments in his brief as to why the provisions of the Texas Constitution he cites provide broader protections than equivalent provisions in the Federal Constitution, and we have previously rejected the arguments he made to the trial court.[78]

---

[75] *Fuentes v. State*, 991 S.W.2d 267, 280 (Tex. Cr. App. 1999); *Green v. State*, 934 S.W.2d 92, 107-07 (Tex. Cr. App. 1996).

[76] 530 U.S. 98 (2000).

[77] *Busby v. State*, 253 S.W.3d 661, 667 (Tex. Cr. App. 2008); *Threadgill v. State*, 146 S.W.3d 654, 671-72 (Tex. Cr. App. 2004).

[78] *See Brooks v. State*, 990 S.W.2d 278, 288-89 (Tex. Cr. App. 1999) (holding that the distinction between "cruel and unusual" and "cruel or unusual" is not obviously important, and adding: "To adequately brief a state constitutional issue appellant must proffer specific arguments and authorities supporting his contentions under the state constitution").

Points forty-three, forty-four, and forty-six through fifty-three are identical to those presented to this Court by the same counsel in *Saldano v. State*.[79] As we did in *Saldano*, we shall "decline appellant's invitation to review our prior decisions."[80] Points of error forty-one through fifty-three are overruled.

We affirm the judgment and sentence of the trial court.

Delivered January 12, 2011.
Do not publish.

---

[79] 232 S.W.3d, at 100-08. In that case, they were points 19, 25, 51, 52, 54, 56, 57, 58, 59, and 61.

[80] *Id.*, at 108-09.